**UNITED STATES of America, Plaintiff,**

v.

**Robert Ian GREATHOUSE, Defendant.**

**No. CR NO. 02–476.**

United States District Court, D. Oregon.

Oct. 20, 2003.

Karin J. Immergut, United States Attorney, District of Oregon, Gregory R. Nyhus, Assistant U.S. Attorney, Portland, OR, for Plaintiff.

Steven T. Wax, Federal Public Defender, Portland, OR, for Defendant.

**Amended**

OPINION & ORDER

KING, District Judge.

Defendant Robert Ian Greathouse is charged in a two-count indictment with the unlawful possession of child pornography in violation of Title 18 U.S.C. § 2252A(a)(5)(B) and a single count of criminal forfeiture of his computer equipment. Defendant moves to suppress all evidence seized from his computer claiming that the search warrant lacked probable cause and that even if there was probable cause for the warrant, there was no probable cause to seize his computer and the officers' execution of the warrant was

overly broad. Defendant also contends that the affidavit included false statements and that he is entitled to relief under *Franks v. Delaware.* Finally, defendant seeks suppression of any statements he made at the time of his arrest because they were either fruits of the allegedly unlawful search, or fruits of an unlawful detention and because his statements were elicited after he requested an attorney. For the reasons which follow, defendant's motion to suppress is GRANTED.

*Background*

In September 2000, the U.S. Customs Cyber Smuggling Center (C3), in conjunction with the German National Police (BKA), received information that a user named "cyotee" was offering Internet access to files containing child pornography. The BKA accessed cyotee's f: server and downloaded eight child pornography images and four child pornography video files.[1] An electronically captured journal of activity with cyotee revealed a directory with several hundred image files with file names suggesting that they also contained child pornography. The BKA determined that "cyotee" utilized the Internet Protocol (IP) address 24.16.213.101, which is registered to the Internet Service Provider (ISP), Excite@Home Network in Redwood City, California.

The BKA shared what it learned with the U.S. Customs CyberSmuggling Center (C3) in Virginia. C3 issued a U.S. Customs summons to Excite@Home seeking subscriber information for IP address 24.16.213.101. On September 20, 2000, Excite@Home responded that the IP address corresponded to two Login names: "skyzane" and "cyotee" and a subscriber named David Inhen with a residence at 1024 S.W. 179th Avenue in Beaverton, Or-

egon. The response also indicated another IP address associated with Ihnen, IP 24.12.186.104. U.S. Customs Special Agent Ben Hicks reviewed cyotee's activity logs and discovered that cyotee had offered to exchange pornographic images with an entire Internet Relay Channel (IRC)-channel. Agent Hicks also reviewed the images downloaded by the BKA and determined conclusively that they contained illegal child pornography.

Between January and October of 2001, Agent Hicks contacted the Oregon DMV and various utilities and determined that the Beaverton residence was owned by David Inhen and that Dhugal Wulf McArdy was also probably a resident at that same location. Hicks also checked with local law enforcement agencies and learned that there were no reports of any problems associated with that residence. A second U.S. Customs summons was served upon Excite@Home on September 17, 2001, and the company responded that David Ihnen was still the subscriber associated with the suspect IP address and that he used the log-in names of skyzane and cyotee-dog; however, unlike the September 2000 Summons, only one IP address was now associated with Ihnen. This discrepancy was not noted by Hicks in his affidavit.

Hicks indicated in his affidavit that he conducted surveillance of the residence on September 23, 24 and 28, 2001, and observed vehicles parked in the driveway that were registered to Inhen and McArdy. During the hearing, Hicks clarified that he personally observed the residence for approximately six hours over a three day period and that he never saw the

---

1. Agent Hicks' affidavit explains that cyotee maintained an "f-server" or file server that allowed the BKA to dial into his personal computer and access files through a one on one real time connection.

defendant entering or leaving.[2]

On October 16, 2001, Agent Hicks sought and obtained a search warrant for the residence. The warrant authorized the seizure of "any item containing or depicting child pornography," including "any and all computer image data files," computers, disks, disk drives, etc.

On October 17, 2001, the search warrant was executed by U.S. Customs, the FBI, Oregon State Police and the Washington County Sheriff's office. David Ihnen opened the front door and was immediately handcuffed by Agent Hicks. Agent Hicks read the search warrant to Ihnen, advised him of his rights and obtained his signature on a *Miranda* waiver form. Ihnen told Hicks that there were four other people living in the house: (1) Dougal McArdy with whom he shared an upstairs bedroom; (2) Robert Grove, a paraplegic who stayed in the living room; (3) a female who resided in another upstairs bedroom (and who was not present at the time of the search); and (4) the defendant who lived in a back bedroom on the first floor. Ihnen also explained that there were six computers networked together by a single AT & T cable modem and that all but one of the networked computers were located in a den on the first floor; the remaining computer was in the defendant's bedroom. Two other computers were located in the den but were not connected to the network. Inhen also told Agent Hicks that he used the screen name skylos and that Greathouse used the screen name cyotee.

While Agent Hicks was interviewing Ihnen, approximately ten other officers and agents were conducting a protective sweep of the house. Four of the residents were present at the time and each person was handcuffed and brought into the living room for the duration of the search. Agent Hicks was interviewing Ihnen when the defendant was removed from his bedroom; he believes that the defendant was brought into the living room approximately 5–8 minutes after their initial entry.[3] Hicks could not recall which officer or agent removed the defendant from his room, nor did he know if the defendant's door was open or closed when they entered.

Hicks next interviewed McArdy who acknowledged that he lived at the residence with Ihnen, that he worked for Sysco and that while he had used a computer in the residence, he had no interest in child pornography.

The defendant was the final resident interviewed; no statement was taken from Robert Grove. Hicks testified that he either removed the defendant's handcuffs for the interview or moved them to the front. The interview took place in the kitchen which was located adjacent to the living room. Hicks claims that he advised defendant of his rights and that Greathouse then signed a written *Miranda* waiver form without question. Greathouse acknowledged that he used the IRC nickname of cyotee. He also acknowledged that he used his f: server to trade files frequently, that he had a CD burner that contained many images and that he thought there would be no child pornography in his computer, but that he also wouldn't be surprised if they found some there. Hicks replaced defendant's handcuffs and returned him to the living room.

---

**2.** Hicks did not specify, nor was he asked to specify, when he conducted this surveillance and/or whether he was at the residence at different times over the three day period.

**3.** Agent Hicks was the only witness for the government; neither party called any of the other agents or officers present at the search warrant execution.

Greathouse testified that he had a "Do Not Enter" sign posted on his door.[4] He further explained that, on the day the search warrant was executed he was asleep, he was wearing only his underwear and his door was closed when the officers and agents arrived. He was frightened by the officers and disoriented without his eye glasses. He was taken into the living room without opportunity to dress and he remained handcuffed in the living room for approximately an hour before being interviewed. The defendant is a very large man and he testified that the handcuffs caused him considerable discomfort.

Greathouse recalls that Agent Hicks and a female officer interviewed him and that they removed his handcuffs for the interview. He acknowledges that he signed a *Miranda* waiver form, but testified that he first stated that he would talk to an attorney if he knew one and that Hicks told him that one could be provided but it would take some time. Defendant indicated to Agent Hicks that he would prefer to "get this over with" as soon as possible. At the conclusion of the interview his handcuffs were replaced and he was returned to the couch in the living room for another two-three hours while the search was underway.

Hicks explained that he decided to seize all of the computers and shut down the network because he could not tell which of the computers had the suspected child pornography and it would take several days to review and make this determination. Hicks further testified that he could see that the defendant's computer was hooked up to the network because of the presence of a network cable and a network card installed on the computer.

At the hearing, defendant proffered testimony from Robert Young, a computer forensic consultant. Young explained that there is a computer preview program known as ENCASE that has been available for many years that makes it possible to quickly scan computers for certain information. Young testified that, with EN-CASE, a computer could be scanned for the presence of child pornography within just a few minutes. Young also testified that there is a "port scan" that can be used to learn more about the nature of computer equipment. Hicks testified that he was aware of the ENCASE program, that he has this program available, but that he did not bring the program with him for this particular search.

Although Hicks testified that someone on the search team took photographs, none were offered into evidence. Hicks testified that the residence appeared to be lived in communally; he confirmed that there were no separate mail boxes, nor were there any separate entrances, door bells or room numbers. Hicks indicated that he could not recall seeing any signs on the defendant's door when he entered his room to seize the computer. Defendant's bedroom contained only a desk, the computer, a sleeping bag and some personal items scattered throughout. At some point, it was determined that defendant was paying $400 in monthly rent to Ihnen under a sublease arrangement. During the search, agents discovered several boxes in the garage with the name "cyotee" marked on the side; the government does not indicate what, if anything, was found within these boxes.

After seizing all of the computers and related equipment from the residence, a

---

4. The government declined any cross-examination and no evidence (testimonial or otherwise) was offered to rebut defendant's assertion regarding the presence of the sign. Therefore, I have assumed that there was in fact a "Do Not Enter" sign posted on the defendant's bedroom door.

later forensic analysis of the defendant's computer revealed 166 suspect image files which appear to contain child pornography. The government does not indicate that any illegal material was discovered on any other computer, nor has any other resident from the Beaverton address been charged.

*Discussion*

a. *Probable Cause* [5]

Defendant argues that the affidavit submitted in support of the search warrant contained insufficient information to believe that anyone at the Beaverton residence had committed any crime. Defendant raises two specific challenges: (1) that the information was simply too thin; and (2) that the incriminating information was too stale to support probable cause.

■ The warrant clause of the Fourth Amendment requires that the government establish probable cause to justify the issuance of a search warrant. *United States v. Rabe*, 848 F.2d 994, 996 (9th Cir.1988). The issuing magistrate must be convinced that there is at least a "fair probability" that evidence of a crime will be found in the location targeted for a search. *Id.*

In *United States v. Lacy*, 119 F.3d 742 (9th Cir.1997), the U.S. Customs Service received information from a computer billboard service that a Seattle resident had called and received computerized images of child pornography sixteen times. Agents traced the telephone calls to Lacy's address and, ten months later, they sought and executed a search warrant for computer equipment and records. *Id.* at 745.

Like the defendant here, Lacy challenged both the sufficiency of the evidence and its staleness. The Ninth Circuit quickly rejected the sufficiency claim, noting that evidence from the billboard service that the defendant had actually downloaded at least three illegal images was enough to show probable cause. *Id.See also United States v. Grant*, 218 F.3d 72, 75 n. 2 (1st Cir.2000) (probable cause to conduct a search of a child pornography suspect's computer found "based solely on the activities of the defendant's registered screen name.").

As for the ten month lapse, the court noted that a claim of staleness must be evaluated "in light of the particular facts of the case and the nature of the criminal activity and property sought." *Id.* The "mere lapse of substantial amounts of time is not controlling." *Id.* A Customs Agent testified that, in her training and experience, collectors of child pornography tend to preserve their materials for long period periods of time in secure places. Based upon this statement, the court concluded that a ten-month delay was not too long and that the nature of the crime supported an inference that illicit materials would still be found in Lacy's computer. *Id.* at 746. However, the court cautioned that this presumption of long-term retention could not be borne out forever: "[W]e are unwilling to assume that collectors of child pornography will keep their materials indefinitely." *Id. See also United States v. Hay*, 231 F.3d 630, 636 (9th Cir.2000) (noting that even deleted files may be retrieved by a computer expert).

---

**5.** The defendant has raised a number of arguments, many of which have evolved over the course of this case. To the extent that he continues to maintain that the search warrant itself was overly broad because it authorized the search and seizure of an entire computer system, his argument is not well taken. *See*

*United States v. Wong*, 334 F.3d 831, 836–37 (9th Cir.2003); *United States v. Hay*, 231 F.3d 630, 636–38 (9th Cir.2000), *cert. denied*, 534 U.S. 858, 122 S.Ct. 135, 151 L.Ed.2d 88 (2001); *United States v. Lacy*, 119 F.3d 742, 746 (9th Cir.1997).

The government correctly notes that, in a number of cases involving investigations of child pornography possession, staleness arguments have been rejected relative to evidence accumulated more than one year before the execution of the search warrant. However, in each instance cited, the government also had other, more recent evidence of continuing criminal activity to bolster probable cause and freshen the older information. For example, in *United States v. Rabe*, 848 F.2d 994 (9th Cir.1988), a Customs Service agent relied, in part, upon correspondence he had with the defendant two years prior to the search warrant execution. In rejecting Rabe's staleness challenge, the Ninth Circuit noted first that there was also information that Rabe was a pedophile and thus, was even more likely to maintain a collection of illegal materials. Then, the court determined that continued correspondence between Rabe and the agent just prior to the search sufficed to establish a "fair probability" that child pornography would be found at Rabe's residence. *See also United States v. Harvey*, 2 F.3d 1318, 1322–23 (3d Cir.1993) (evidence defendant possessed child pornography 13–15 months previously not stale where supported by evidence of additional mailings within two months of warrant's execution).

 In this case, the agents properly traced the user name cyotee by checking ISP records and confirming the user identity with DMV and utility records. Based upon the information from the BKA and C3, as of September, 2000, Agent Hicks had probable cause to believe that a computer located within the Beaverton residence contained child pornography. Relying upon *United States v. Hay*, 231 F.3d 630 (9th Cir.2000), defendant argues that the absence of additional investigation into who may have actually been using the computer and where the computer could have been located mandates suppression. However, *Hay* involved an investigation into a computer located somewhere on the University of Washington campus. After receiving information that child pornography had been transmitted to a particular IP address on the campus, Customs Agents did additional investigation to ensure that the suspect computer had only one user, and to determine the exact location of that particular computer. 231 F.3d at 632. Here, unlike *Hay* or defendant's "rogue law clerk" example, agents traced the suspect materials to a single family residence. While defendant may criticize the thoroughness of Hicks' surveillance of the property and his background investigation,[6] I find that it was entirely reasonable for the agents to presume, based upon the evidence available, that they were investigating a single computer located in a single family residence. Given those assumptions, the type of further narrowing investigation described in *Hay* was not constitutionally required.

Further, the fact that the actual user of the computer may not have been known conclusively at that time does nothing to diminish probable cause. As the Ninth Circuit noted in *Hay*, "[I]t is well-established that a location can be searched for evidence of a crime even if there is no

---

**6.** While I find that Agent Hicks was forthright in his description of his investigation, I was troubled by his testimony that he also had checked with the postal inspector about who had been receiving mail at the residence. There was nothing in his written report to substantiate this claim and the defendant testified that he and the other residents received mail "regularly." The government offered no evidence to rebut defendant's assertion and, thus, I am left with the conclusion that either Hicks testified falsely about having checked with the postal inspector or the postal inspector provided Hicks with incorrect or incomplete information.

probable cause to arrest the person at the location." 231 F.3d at 634. Accordingly, there was sufficient information to give rise to probable cause to believe that evidence of child pornography would be found at a computer at the Beaverton residence.[7]

Defendant's claim that the information obtained from the German police was stale is more problematic. The parties have not cited, nor have I been able to find any case involving a similar crime in which such a lengthy period of time has passed between the gathering of any incriminating information and the execution of the warrant. There is simply no evidence presented here of any ongoing criminal activity. During the hearing, Agent Hicks was asked if the BKA or C3 ever came across cyotee again. Hicks indicated that they did not and that he never asked for any follow-up information because it would have been "like looking for a needle in a haystack." Hicks testified that those who traffic in child pornography typically change their names too frequently to make any such additional search useful. However, by September of 2001, Hicks had obtained additional information from Excite@Home.com that cyotee was still the registered screen name for David Ihnen at 1024 S.W. 179th Avenue in Beaverton. Despite learning this, no attempt to determine if cyotee had engaged in any additional, more recent activity was ever undertaken.

In the absence of ongoing, continuous criminal activity, this case presents the court with a difficult line-drawing decision. Like the agent in *Lacy*, Agent Hicks indicated in his affidavit that child pornography collectors routinely maintain their ma-

terials for long periods of time. However, Agent Hicks was unable to specify the source of this assumption—it appears to be based upon a generalized sense developed through informal conversations with other agents. It is not based upon any empirical data or studies, nor is there any apparent differentiation in this assumption for those who collect for distribution and those who collect because they are also pedophiles. Also, the assumption fails to address whether and how it might be influenced by the medium involved; unlike hard copies of materials sent through the U.S. mail, computer equipment and hard drives become obsolete quickly as technology advances. The fact that an illegal image may be found on an f:serve in September of 2000, and the assumption that child pornography collectors maintain these images for long periods of time does not account for the frequent upgrades in computer systems. Over the course of a year, it is highly possible that hard drives or entire systems could be replaced and the illegal material lost with the old system. In this case, there is no evidence that the defendant was or is a pedophile and there is nothing to suggest that he engaged in any ongoing criminal activity.

In *Lacy*, the Ninth Circuit specifically cautioned that it would not extend the presumption that child pornography collectors or distributors would retain their materials indefinitely, but determined that ten months with no intervening evidence of criminal activity is not too long. One court has held that six months may be too long: in *United States v. Zimmerman*, 277 F.3d 426, 433–34 (3d Cir.2002), the Third Circuit held that the a viewing of a pornographic

7. I also reject defendant's alternative request for suppression under *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). While I disagree with the government's position that defendant should be pro-cedurally barred from raising a Franks challenge after an evidentiary hearing, I find that none of the alleged misstatements or omissions were critical to the probable cause inquiry.

video file on the defendant's computer six months prior to the execution of the search warrant was too stale, absent any evidence that the defendant had actually downloaded the video clip and absent evidence of continuous criminal activity. Carefully considering all of the factors present in this case, including the limited incriminating evidence, the absence of any evidence of intervening criminal activity, the absence of any evidence that cyotee was a pedophile, and the fact that computer equipment becomes obsolete very quickly, I find that the thirteen month delay in this case is simply too long. If a line must be drawn in internet child pornography cases, I find that the line is one year absent evidence of ongoing or continuous criminal activity. Further, no explanation or justification for such a significant delay was ever offered. By the time the search warrant in this case was executed, it was possible that investigators might have discovered incriminating evidence; however, I cannot find that there still existed a "fair probability" that child pornography would be found.

Based upon the foregoing, I find that while the affidavit alleged sufficient facts to give rise to probable cause, the critical information giving rise to that probable cause was too stale at the time of the search warrant execution to justify the search. Accordingly, defendant's motion to suppress evidence is GRANTED on this basis.

8. The government does argue that "the entire house was suspect," and that this would also have justified a search of defendant's room. This goes too far, since it was the computers in the residence that were suspect—assuming that the defendant had a separate residence, had there been no computer in the defendant's room, officers could not have searched his room for any other evidence of child pornography absent a separate warrant.

b. *Separate Residences*

Although I ordinarily decline to address alternative arguments mooted by a decision, given the closeness of the foregoing issue, I will address one other basis for suppression of the evidence in this case. There is no dispute that the officers did not know, and had no way of knowing that they would find eight computers and five adult residents at the Beaverton address; had they known this, further refinements might have been possible.

Defendant testified that he had his own separate bedroom and that he was the only person in the residence who had access to that room; the government appears to concede that if the defendant is correct, a separate search warrant should have been obtained.[8] However, the government claims that there was nothing to indicate that the defendant had exclusive use or control of the room in which his computer was seized.

 The Ninth Circuit has noted that the search of a guest room in a single family home that is rented or used by a third party "to the extent that the third party acquires a reasonable expectation of privacy" requires a warrant. *United States v. Cannon*, 264 F.3d 875 (9th Cir. 2001), *cert. denied*, 534 U.S. 1143, 122 S.Ct. 1097, 151 L.Ed.2d 994 (2002).[9] Two factors direct this inquiry: (1) whether the individual has taken steps to "preserve" the area as "private;" and (2) whether that

9. The Ninth Circuit cited *Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978) in support of this general proposition. However, *Rakas* involved an automobile search and the issue of whether passengers traveling in that automobile had standing to contest a search of the glove compartment. The Supreme Court's decision had nothing to do with guest rooms or rented rooms and I could find no discussion of this topic anywhere within the text of that decision.

person's expectation of privacy was reasonable. *Id.* The court must also examine whether the homeowner and/or target of the investigation had control of the entire house and access to the area claimed by the defendant. *United States v. Gilman*, 684 F.2d 616 (9th Cir.1982); *see also United States v. Ayers*, 924 F.2d 1468, 1480 (9th Cir.1991) (upholding search warrant for entire family residence where target of investigation has access to all areas); *Mena v. City of Simi Valley*, 226 F.3d 1031, 1038 (9th Cir.2000) (if defendant is in control of the whole premises entire property is suspect).

In *Maryland v. Garrison*, 480 U.S. 79, 107 S.Ct. 1013, 94 L.Ed.2d 72 (1987), police officers obtained a search warrant for the entire third floor of a building, not knowing that there were actually two separate apartments on the third floor. The officers seized evidence from the "wrong" apartment before realizing their error; they immediately ceased their search and moved on to the targeted apartment. The Supreme Court held that where the officers' failure to realize the overbreadth of the warrant was objectively reasonable, no Fourth Amendment violation occurred.

In *Cannon*, the Ninth Circuit held that a separate rear dwelling unit occupied by a third party did not fall within the parameters of a search warrant for the main residence. The court noted that because the rental unit contained its own kitchen appliances and its own bathroom, it was "clearly a separate dwelling for which a separate warrant was required." 264 F.3d at 879. *See also Mena*, 226 F.3d at 1038 (factors relevant to separate residence issue include that rooms were padlocked and self-contained); *United States v. Williams*, 917 F.2d 1088 (8th Cir.1990) (officers could reasonably believe they were searching a single family dwelling despite numbers, deadbolt locks and separate doorbells).

The government argues that because the defendant's bedroom was not a self-contained unit with its own appliance and bathrooms, and because there was no separate lock, number or entrance, the officers necessarily acted reasonably in concluding that the entirety of the residence was occupied in common.

First, I note that the focus under *Maryland v. Garrison* must be upon the reasonableness of the officers' actions under the circumstances. When they entered the residence, they did not know that the defendant in fact kept to himself in his bedroom. However, I disagree with the government's assertion that the physical layout is dispositive. Doorbells, deadbolts and separate appliances are certainly indicia of separate units, but nothing in the case law indicates that these are prerequisites. Nor is there any support for the assumption that unrelated people who share a house, but maintain separate bedrooms have no independent right to privacy in bedrooms maintained for their exclusive use. In this case, there is no dispute that the kitchen, bathroom and living room areas were occupied in common. There is also no dispute that the defendant's bedroom door was closed when the officers and agents entered and that he had a "Do Not Enter" sign posted on his door. There was no lock on the door, no number and no separate door bell.

■ However, the agents and officers were immediately advised by David Ihnen that the defendant was a renter and that he lived in the back bedroom on the first floor. It was also apparent to the officers that there was no familial relation between any of the residents; they were simply a group of people sharing a house. I find that, upon learning this information from Ihnen, when coupled with the sign on the defendant's door and the apparent absence of any familial or other connection between

the residents, the agents at that point should have known there were separate residences within the house and should have stopped and obtained a second warrant for the defendant's bedroom. There is no question that they could have secured the area and obtained a telephonic warrant without fear of destruction of evidence. Their failure to do is an alternative basis for suppression of the evidence.

### c. Seizure for Later Review

Defendant also claims that the seizure of all eight computers was overly broad and he challenges, under *Franks*, Agent Hicks' statement in the search warrant affidavit that the computers would need to be searched off-site by a forensics expert. Defendant relies upon Robert Young's testimony regarding the ENCASE preview program.

Numerous cases have upheld the wholesale seizure of computers and computer disks and records for later review for particular evidence as the only reasonable means of conducting a search. *See Hay*, 231 F.3d at 637 (agents justified in taking entire computer system off-site for proper analysis); *Lacy*, 119 F.3d at 746; *United States v. Upham*, 168 F.3d 532, 534 (1st Cir.1999).

■ However, I recognize that this may not always be true due to technological developments. In this case, I find that Agent Hicks acted in reasonable reliance upon well-settled and clear Ninth Circuit authority upholding the right of investigating authorities to seize computers for later forensic analysis given that he had no way of knowing, prior to entry, that he would encounter eight computers instead of one. Had there been any evidence that a number of suspect computers would be found on site, there may well be an obligation to use a program like ENCASE to more

narrowly tailor the search and seizure. This is not that case.

### d. Suppression of Statements

Defendant moves to suppress statements he made following the advice of rights on numerous grounds. I need only address two which I find dispositive. First, any statements elicited were tainted by the stale search warrant. Second, based upon a very recent Ninth Circuit decision, I find that defendant's statements were tainted by his unlawful detention in violation of the Fourth Amendment.

■ There is absolutely no question that officers and agents may detain all of the residents or occupants of a dwelling or office in a single room during the execution of the search warrant, even if the detention lasts several hours. *Ganwich v. Knapp*, 319 F.3d 1115, 1120 (9th Cir.2003). The issue raised here is the manner of that detention and whether it was reasonable under the circumstances. *See Franklin v. Foxworth*, 31 F.3d 873, 875 (9th Cir.1994). The reasonableness of the seizure and detention depends upon the totality of the circumstances which includes the following factors: (1) the severity and nature of the crime under investigation; (2) whether the suspect poses an immediate threat to officer safety; and (3) whether the person actively resists arrest. *Id.* at 876. The court should also examine whether the detention is "unnecessarily painful, degrading, or prolonged, or if it involves an undue invasion of privacy." *Id. See also Mena*, 226 F.3d at 1040–41.

■ In *Meredith v. Erath*, 342 F.3d 1057 (9th Cir.2003), the court held that "detaining a person in handcuffs during the execution of a warrant to search for evidence is permissible, but only when justified by the totality of the circumstances." *Id.* at 1062–63. Thus, a per se policy or practice of handcuffing all of the residents

of a house during the execution of a search warrant is not going to survive Fourth Amendment scrutiny.

■ In this case, the government offered no reason to believe that any of the residents posed a particular threat of harm or danger of flight. Although four adult males were present, one was a paraplegic in a wheelchair and the defendant was in his underwear and without his eye glasses. With agent Hicks, there were at least 10 and perhaps 11 officers and agents on the scene and readily capable of maintaining control. Further, as in *Meredith*, the nature of the crime being investigated was non-violent and did not pose any inherent threat of harm to adult police officers and government agents. Finally, while the defendant apparently struggled to free his hands from his sleeping bags when the officers initially entered his room, there was no testimony or evidence offered to suggest that he (or anyone else in the residence) resisted arrest in any way. Based upon the foregoing and considering the totality of the circumstances, I find that handcuffing the defendant during the execution of the search warrant constituted an unreasonable restraint in violation of the Fourth Amendment.

■ Having established a fourth amendment violation relative to the nature of his detention, the government bears the burden of establishing the absence of any causal connection between the illegality and the evidence sought to be suppressed. *United States v. Chamberlin*, 644 F.2d 1262, 1269 (9th Cir.1980).[10] The Supreme Court has rejected a "but for" test and held that the focus should be upon whether the government obtained the challenged evidence by an independent means. *See United States v. Foppe*, 993 F.2d 1444,

1449 (9th Cir.1993) (citing *Wong Sun*). Re-stated positively, the Ninth Circuit has held that the central inquiry is "whether the illegal activity tends to significantly direct the investigation to the evidence in question." *Chamberlin*, 644 F.2d at 1269. Factors the court must consider include the proximity of the illegality to the acquisition of the challenged evidence, whether there were intervening events that led investigators to the evidence, and "the effect of suppression on the exclusionary rule's purpose of deterring police misconduct." *United States v. Shephard*, 21 F.3d 933, 938 (9th Cir.1994). "The closer the link between the illegal arrest and the seizure, the more likely we are to conclude that there is 'exploitation' of the arrest by the police." *Id.*

■ First, I find that there is no need here to deter police misconduct because the issue of whether and when investigators could handcuff residents during a search warrant was unsettled until the *Meredith* decision. In fact, the court ultimately held that although the plaintiffs in that case established a fourth amendment violation based upon the fact that they were handcuffed during the execution of the search warrant, the officers were entitled to qualified immunity because the issue was unsettled. However, we do have uncontroverted evidence from the defendant that he waived his *Miranda* rights because he was frightened and he "just wanted to get this over with as soon as possible." Given the immediate temporal proximity between the unlawful detention and the defendant's confession and the absence of any intervening circumstances, I find that the defendant's confession was tainted by his unlawful detention and, thus, suppression is warranted on this basis as well.

---

**10.** The question of taint is separate and distinct from the issue of the voluntariness of the defendant's confession. *See United States v. Becker*, 333 F.3d 858, 861 (8th Cir.2003).

*Conclusion*

Based upon the foregoing, I find that the critical information in the affidavit in support of the search warrant was based upon stale information and thus, the warrant lacked probable cause. I also find that the defendant's statements were tainted by the search and his unlawful detention. Accordingly, defendant's motion to suppress (# 18) is GRANTED.

IT IS SO ORDERED.