**2015 UT App 185**

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Plaintiff and Appellee,
*v.*
EVAN D. BOYLES,
Defendant and Appellant.

Opinion
No. 20130578-CA
Filed July 30, 2015

Second District Court, Ogden Department
The Honorable W. Brent West
No. 111901766

Evan D. Boyles, Appellant Pro Se

Dee W. Smith, Branden B. Miles, and Brody E.
Flint, Attorneys for Appellee

JUDGE JOHN A. PEARCE authored this Opinion, in which JUDGES
STEPHEN L. ROTH and MICHELE M. CHRISTIANSEN concurred.

PEARCE, Judge:

¶1     This case considers whether police officers executing a
search warrant for a single-level, three-bedroom house needed to
obtain a new warrant after they encountered a locked interior
door sporting a no-trespassing sign. We conclude that the trial
court did not err by determining that the locked door and sign
were insufficient to provide a reasonable officer notice that the

bedroom behind the door was a separate residence.[1] We therefore affirm the trial court's denial of the defendant's motion to suppress the evidence found in that bedroom.

## BACKGROUND

¶2　A confidential informant told the police that he had purchased methamphetamine from James Fitts on multiple occasions. According to the informant, he had purchased the drugs at Fitts's residence and Fitts stored his merchandise in his bedroom.

¶3　Under police direction, the informant then made two controlled purchases of drugs from Fitts. The informant first went to the house and bought methamphetamine from Fitts using marked money. After this purchase, the informant reported that three people lived in the house: James Fitts, Evan D. Boyles, and K.Z. The second controlled purchase also took place at the house. The informant noted that Boyles had been "present at the location" during the second transaction.

¶4　The police sought a search warrant. The affidavit supporting the warrant request recounted the facts the informant provided. The affidavit also detailed Fitts's and Boyles's criminal histories. The affidavit noted that Boyles resided at the house, that he had "an extensive history of Possession of Illegal Narcotics," and that four of Boyles's nine prior convictions had involved drugs.[2] The police requested a

---

1. For the purposes of this opinion, we assume, without deciding, that the bedroom was a separate residence.

2. According to the affidavit, Boyles had been convicted of possessing methamphetamine twice and had pled guilty to possessing methamphetamine with intent to distribute on a third occasion.

search warrant to seize methamphetamine and drug paraphernalia from James Fitts, the house, and the house's curtilage. Specifically, the affidavit described the property to be searched as including "all outbuildings, garages, sheds, vehicles, trailers, boats, locked containers, and other property contained within the property lines (curtilage)." Citing officer safety and the possibility of evidence being destroyed, the affidavit asked "that the police officers executing the search warrant not be required to give notice of authority (no-knock) and be able to execute the search warrant day or night." A district court judge reviewed the affidavit and issued a warrant to search Fitts and the house.

¶5    Police officers executed the warrant on July 12, 2011. When the officers arrived, Boyles and his girlfriend were in the backyard. Boyles and Fitts were detained while the officers searched the house. While the officers did not know the "entire layout of the home" when they entered, one officer later testified that he "had an idea" which room was Fitts's.

¶6    While searching the house, the officers encountered a locked door with a no-trespassing sign hanging on it. Officers broke down the door and discovered a bedroom containing drug paraphernalia. When asked, Boyles admitted that the locked bedroom was his. The officers also found heroin in another room, later identified as Fitts's bedroom.[3]

¶7    The State charged Boyles with possession of drug paraphernalia. Boyles elected to represent himself at the pretrial proceedings and at trial. Boyles filed a motion to suppress the evidence discovered in his bedroom. After a hearing on the

---

3. The record does not reveal the order in which the officers searched the two rooms nor does it reveal the point at which the officers confirmed that the bedroom containing heroin was Fitts's.

motion, the trial court found that the officers had acted in good faith in obtaining the warrant and that the warrant allowed the officers to search the entire property. The trial court further found (1) that Boyles "maintain[ed] a separate, locked bedroom within the home"; (2) that although "the officers had reason to believe there were multiple people living in the home, there is no evidence that the police officers knew that [Boyles] maintained exclusive control over a particular bedroom"; and (3) that there "was no indication that the bedroom was intended to be a separately occupied portion of the home like an apartment." The court concluded that the "scope of the search warrant reasonably included [Boyles's] room" and therefore denied the motion to suppress. A jury convicted Boyles of possession of drug paraphernalia, a class A misdemeanor. Boyles appeals.[4]

ISSUE AND STANDARD OF REVIEW

¶8     Boyles contends that the trial court erred by denying his motion to suppress. He argues that the officers lacked probable cause to search his bedroom and that the warrant failed to properly describe the place to be searched. In an appeal from the denial of a motion to suppress evidence, we review the trial

---

4. Boyles was represented by appointed counsel throughout the appellate process. Counsel filed briefs and participated in oral argument. After the oral argument in this matter, counsel sought to withdraw because Boyles expressed dissatisfaction with his representation and threatened to file legal action against him. Counsel requested that Boyles be appointed a new attorney or be allowed to proceed pro se. We granted the motion to withdraw and remanded to the district court. At a subsequent hearing, the district court noted that this matter had been fully briefed and argued and that "[a]ll parties agreed that the case can be submitted to the Appellate Court for decision." The district court also permitted Boyles to proceed pro se.

court's factual findings for clear error and its conclusions of law for correctness. *State v. Rogers*, 2014 UT App 89, ¶ 4, 325 P.3d 884.

ANALYSIS

¶9 The Fourth Amendment to the United States Constitution protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." "[T]he touchstone of [Fourth] Amendment analysis has been the question whether a person has a constitutionally protected reasonable expectation of privacy." *Oliver v. United States*, 466 U.S. 170, 177 (1984) (citation and internal quotation marks omitted). We assume, without deciding, that Boyles had a reasonable expectation of privacy with respect to his bedroom independent of that which he enjoyed as to the house as a whole.

¶10 Police officers generally need a warrant to search a place in which a person has a reasonable expectation of privacy. *See Franks v. Delaware*, 438 U.S. 154, 164 (1978) ("The bulwark of Fourth Amendment protection, of course, is the Warrant Clause, requiring that, absent certain exceptions, police obtain a warrant from a neutral and disinterested magistrate before embarking upon a search."). Before issuing a search warrant, a magistrate must determine that probable cause exists to conduct the search, *id.*; often, this determination is based upon an affidavit filed by the investigating officer. "[A] warrant affidavit must set forth particular facts and circumstances underlying the existence of probable cause, so as to allow the magistrate to make an independent evaluation of the matter." *Id.* at 165.

I. Validity of the Search Warrant

¶11 Boyles contends that the affidavit in his case "misrepresented the true nature of the living arrangement" and was therefore invalid. He argues that "[t]his deprived the

magistrate of the ability to accurately assess probable cause for the entire structure, since he did not know that Mr. Boyles had a separately accessed and rented space."[5] He asserts that, "[h]ad the court known that fact, it would have granted the search warrant, but excepted Mr. Boyles' room from the search."

¶12 "When the Fourth Amendment demands a factual showing sufficient to comprise 'probable cause,' the obvious assumption is that there will be a truthful showing." *Franks*, 438 U.S. at 164–65 (emphasis omitted) (citation and internal quotation marks omitted). "This does not mean 'truthful' in the sense that every fact recited in the warrant affidavit is necessarily correct, for probable cause may be founded upon hearsay and upon information received from informants, as well as upon information within the affiant's own knowledge that sometimes must be garnered hastily." *Id.* at 165. Rather, a warrant affidavit "is to be 'truthful' in the sense that the information put forth is believed or appropriately accepted by the affiant as true." *Id.*

¶13 A warrant is not necessarily invalidated by the later discovery that some of the information supporting the warrant is inaccurate. *Maryland v. Garrison*, 480 U.S. 79, 85–86 (1987). In *Garrison*, police officers possessed a valid warrant to search "the person of Lawrence McWebb and 'the premises known as 2036 Park Avenue third floor apartment'" for drugs. *Id.* at 80. When the police applied for the warrant and when they began their search, they reasonably believed there was only one apartment on the third floor. *Id.* While executing the warrant, the officers entered a vestibule on the third floor and encountered two open doors. *Id.* at 81. They began searching and discovered

---

5. Boyles's basis for claiming that his room was "separately accessed" is unclear. Every indication in the record before us suggests that Boyles and the officers accessed the room using an interior door in the house.

incriminating evidence including heroin. *Id.* However, they then realized that the third floor was in fact divided into two apartments—one occupied by McWebb and the other by Garrison. *Id.* The officers stopped searching Garrison's apartment once the separate nature of the apartments became apparent. *Id.* Garrison was charged with and convicted of drug possession on the basis of the heroin found in his apartment. *Id.* at 80.

¶14 The United States Supreme Court framed the question before it as, "[W]hether that factual mistake invalidated a warrant that undoubtedly would have been valid if it had reflected a completely accurate understanding of the building's floor plan." *Id.* at 85. The Court noted that the warrant's "description of [the place to be searched] was broader than appropriate because it was based on the mistaken belief that there was only one apartment on the third floor of the building at 2036 Park Avenue." *Id.* But "the discovery of facts demonstrating that a valid warrant was unnecessarily broad does not retroactively invalidate the warrant." *Id.* Because the officers could not have reasonably known of their factual mistake at the time they applied for the warrant, the Court concluded that the warrant was validly issued. *Id.* at 85–86.

¶15 Boyles contends that the warrant in this matter was invalid because the investigating police officer should have alerted the magistrate that the area to be searched included an enclave over which Boyles exercised exclusive control and thus entertained a reasonable expectation of privacy. *See United States v. Acosta*, 965 F.2d 1248, 1252 (3d Cir. 1992) ("[O]nly when the defendant has the right to keep a place private and subject to his exclusive control would reasonable expectations of privacy attach."); *cf. State v. Loya*, 2001 UT App 3, ¶ 24, 18 P.3d 1116 (noting that a defendant may lose whatever reasonable expectation of privacy he or she has regarding a hotel room when he or she no longer exercises exclusive control of the room). Boyles's contention presupposes that the investigating officer knew or believed that each of the three residents of the

house rented separate rooms from the owner and maintained exclusive control over their respective rooms, yet omitted that information from the affidavit. But the record gives us no reason to believe that the officer knew Boyles maintained exclusive control over a particular bedroom or any bedroom at all. Nor does Boyles point to any record evidence suggesting that the officer had such knowledge when he swore the affidavit.

¶16   Instead, Boyles relies on the officer's response to the question, asked at trial, "[Did] you know which bedroom was [Fitts's] before you executed the warrant?" The officer answered that he "had an idea of which one was [Fitts's.]" Boyles assumes from this that if the officer knew which bedroom belonged to Fitts, the officer must also have known which bedroom belonged to Boyles. Boyles's reliance on this colloquy depends on the uncertain assumptions that (1) if Fitts had a bedroom, Boyles must have had one as well and (2) all the residents of the house treated their respective rooms as areas over which they exercised exclusive control. The officer's trial testimony falls short of supporting an inference that the officer knew, at least at the time he sought the warrant, that Boyles maintained his bedroom as a separate residence inside the house.

¶17   Boyles does not identify any other relevant information known to the officer but omitted from the affidavit. As a result, Boyles has not carried his burden of showing that the officer knowingly misrepresented information in the affidavit so as to render the resulting warrant invalid.[6]

---

6. Boyles may be arguing that the investigating officer should have inferred that the three residents of the house each maintained bedrooms as separate residences within it and that the officer should therefore have included such an inference in the affidavit. But all of the information from which that inference could possibly be drawn was presented to the magistrate, and

(continued...)

## II. Officers' Good Faith in Executing the Warrant

¶18    Boyles contends that the officers executing the search warrant did not act in good faith.[7] Specifically, he asserts that the

---

(…continued)
the magistrate was therefore in an equal position to assess that possibility. The affidavit presented to the magistrate noted that three people resided at the house, that two of those people (Fitts and Boyles) had criminal histories involving drugs, that Fitts had sold drugs to the informant, that Boyles was "present at the location" during one of the controlled purchases, and that the informant believed Fitts kept the drugs in his bedroom. We therefore cannot conclude that the officer acted improperly by refraining from drawing the inference in his affidavit that Boyles possessed a bedroom in which he had a separate reasonable expectation of privacy.

7. The issue of whether the officers *executed* the warrant in good faith does not appear to have been raised in Boyles's pro se motion to suppress or in his arguments at the suppression hearing. As a result, the trial court's findings concerned the scope of the search warrant and did not specifically address the officers' good faith in conducting the search. Issues that are not preserved are generally considered to have been waived. *Wohnoutka v. Kelley*, 2014 UT App 154, ¶ 3, 330 P.3d 762. However, "[o]ur preservation requirement is self-imposed and is therefore one of prudence rather than jurisdiction." *Patterson v. Patterson*, 2011 UT 68, ¶ 13, 266 P.3d 828. "Consequently, we exercise wide discretion when deciding whether to entertain or reject matters that are first raised on appeal." *Id.* Here, Boyles represented himself at the time of the motion and hearing. Although a pro se defendant is required to adhere to procedural rules and the law, his or her lack of technical knowledge of law and procedure should be accorded every consideration that may reasonably be indulged. *Orem City v. Bovo*, 2003 UT App 286,

(continued...)

officers' "prior knowledge, coupled with their discoveries on the scene through questioning and the discovery of a locked door with a no trespassing sign," should have led them to the conclusion that the bedroom behind the door was a "private space in which Mr. Boyles had manifested an objectively reasonable expectation of privacy." He urges that the officers "should have limited their investigation to the areas over which Mr. Fitts—the only person against whom they had probable cause—had the ability to control, such as his bedroom, the kitchen or other common areas over which he had access."[8]

¶19    The United States Supreme Court has instructed that in the course of executing a warrant, police officers may encounter

---

(…continued)
¶ 12, 76 P.3d 1170. Because Boyles was self-represented at the time of the motion and hearing, and because the State did not raise a preservation challenge to Boyles's appeal, we exercise our discretion to address the merits of the good-faith-search issue.

8. Several of Boyles's arguments assert that the officer admitted that he lacked probable cause to search Boyles's bedroom. Boyles relies on the officer's testimony, "I did not have probable cause that [Boyles was] per se the one distributing the methamphetamine. I was given information that [he lived] there and that [he was] a user, but I did not have probable cause." However, Boyles takes this testimony out of context. The officer was responding to the question Boyles posed: "Why didn't [the] affidavit list [Boyles] as a person to be taken into custody if you knew [he] was a resident there and there was drugs [sic] being done there at the location?" Read in context, the officer was admitting that he lacked probable cause to arrest Boyles, not that he lacked probable cause to search Boyles's bedroom. Boyles does not explain why the absence of probable cause for the arrest of a person necessarily translates into a lack of probable cause to search a bedroom.

new information that would put a reasonable officer on notice that the existing warrant is overly broad. When that occurs, the officer should seek a new warrant. In *Maryland v. Garrison*, after holding that later discoveries did not alone render the previously issued warrant invalid, the Supreme Court turned to the question of "whether the execution of the warrant violated [Garrison's] constitutional right to be secure in his home." 480 U.S. 79, 86 (1987). "[T]he validity of the search of [Garrison's] apartment pursuant to a warrant authorizing the search of the entire third floor depends on whether the officers' failure to realize the overbreadth of the warrant was objectively understandable and reasonable." *Id.* at 88.

¶20 The Supreme Court concluded that, "[p]rior to the officers' discovery of the factual mistake, they perceived McWebb's apartment and the third-floor premises as one and the same; therefore, their execution of the warrant reasonably included the entire third floor." *Id*. Accordingly, "the officers' conduct was consistent with a reasonable effort to ascertain and identify the place intended to be searched within the meaning of the Fourth Amendment." *Id.* Because the incriminating evidence was discovered before the point at which the warrant no longer supported the search, i.e., when the officers realized (or reasonably should have realized) that the third floor comprised two separate residences, suppression of that evidence was improper. *Id.* at 88–89; *see also United States v. Kyles*, 40 F.3d 519, 524 (2d Cir. 1994) ("If, during the search, the officers become aware that the warrant describes multiple residences, the officers must confine their search to the residence of the suspect.").

¶21 Here, the question before us focuses on whether the officers realized or should have realized that Boyles's bedroom was a separate residence. The trial court concluded that the searching officers had no indication that Boyles's bedroom was an enclave within and separate from the rest of the house. On appeal, Boyles challenges the trial court's conclusions that, although "the officers had reason to believe there were multiple people living in the home, there is no evidence that the police

officers knew that [Boyles] maintained exclusive control over a particular bedroom" and that there "was no indication that the bedroom was intended to be a separately occupied portion of the home like an apartment."[9]

¶22    Boyles identifies four categories of evidence that he argues should have tipped the officers off to the existence of his private enclave within the house: (1) "their prior knowledge," (2) "their discoveries on the scene through questioning," (3) the locked door, and (4) the no-trespassing sign on that door.

¶23    Boyles does not specify what evidence comprises the first two categories. We assume that by "prior knowledge," Boyles refers to the fact that the investigating officer knew that three people resided at the house. But three people—even people possessing different last names—may well reside in a house together without dividing the house into separate residences. *Cf. Commonwealth v. Smith*, 898 S.W.2d 496, 501 (Ky. Ct. App. 1995) ("The multiple-occupancy rule [for analyzing whether a reasonable expectation of privacy exists] is predicated upon the thesis that occupants of a single living unit, whether related or not, generally have at least some access to each other's bedrooms." (citation and internal quotation marks omitted)); *State v. Sheehan*, 524 A.2d 1265, 1270 (N.J. Super. Ct. App. Div. 1987) (same). The existence of multiple unrelated people who reside in the house does not lead inexorably to the conclusion

---

9. The trial court's written ruling included these sentences as part of its findings of fact. However, at least as applied to Boyles's unpreserved good-faith-search contention, *see supra* ¶ 18 n.7, they appear to be conclusions of law. Because the trial court's findings withstand the scrutiny of our non-deferential correctness review—the most favorable standard to Boyles—we apply that standard because application of a more deferential standard would not change the outcome in this case. *See State v. Rogers*, 2014 UT App 89, ¶ 4, 325 P.3d 884.

that those unrelated persons live in separate residences under the same roof. *See United States v. Hinds*, 856 F.2d 438, 441 (1st Cir. 1988) (explaining that "the mere presence of more than one family in a building [does not] automatically change[] its character from single family to multifamily"). Indeed, courts have treated a variety of factors as relevant to the separate-residence inquiry. *See, e.g., id.* at 441–42 ("There were no indications, such as separate doorbells or mailboxes, that more than one family" resided at the building to be searched); *Kyles*, 40 F.3d at 524 ("Factors that indicate a separate residence include separate access from the outside, separate doorbells, and separate mailboxes."); *United States v. Cannon*, 264 F.3d 875, 879 (9th Cir. 2001) (considering an officer's discovery of a separate bathroom and "a wood burning stove, cooking stove, refrigerator, and sink" within what originally appeared to be a garage and concluding that the building was "a separate dwelling for which a separate warrant was required"); *United States v. Fennell*, 496 F. Supp. 2d 279, 281 (S.D.N.Y. 2007) ("Indicia of a separate residence include separate entrances, separate doorbells, separate house numbers, name plates, and mailboxes."); *United States v. Maneti*, 781 F. Supp. 169, 175 (W.D.N.Y. 1991) ("The dwelling does not have separate visible doorbells, mailboxes, speaking tubes, name plates, or apartment numbers to indicate multiple residency."); *State v. Ramirez*, 195 P.3d 460, 463 (Or. Ct. App. 2008) ("[P]ertinent considerations" as to whether a separate unit exists include "the actual physical structure of the residence," "whether there are separate entrances or separate numbers on doors in the residence," the presence of locks, and whether other occupants have access).

¶24    We also assume that "[the officers'] discoveries on the scene through questioning" refers to Boyles's claim that, during the search, he informed one of the officers that he had a separate room. As noted above, the record does not indicate at what point during the search Boyles gave this information to the officer questioning him. Boyles was outside when the search began and remained in the backyard during his questioning. As a result, the record does not support an inference that Boyles gave this

information to the questioning officer before the searching officers discovered the drug paraphernalia in Boyles's bedroom.[10]

¶25 Even if Boyles had claimed to the searching officers that his room was a separate residence, it is not clear that those officers were required to accept his claim at face value. *See United States v. Esterline*, 287 F. App'x 693, 699 (10th Cir. 2008). In *Esterline*, police officers arrested Virgil Counts after discovering drugs and a pair of drug-dusted digital scales in his car. *Id.* at 695. The officers obtained a search warrant for Counts's residence. *Id.* "Upon arrival, the officers encountered [Counts's] architecturally unique residence. It consisted of a fusion of several rectangular shaped trailer houses physically attached to one another to form a single unit." *Id.* "The doors between each structure were combined in such a manner [as] to permit passage from one trailer to another without going outside." *Id.* The building was identified by a single address. *Id.* A search of this sejungible structure revealed the defendant Douglas Esterline, his drug stash, and his illegal firearm. *Id.* Esterline informed the officers that he had rented the front part of one of the trailers—consisting of a living room, a kitchen, and a bedroom—as a separate residence. *Id.* at 696. Esterline's portion of the trailer had a separate lock. *Id.*

¶26 Esterline was charged with various crimes and unsuccessfully sought to suppress the evidence discovered in his portion of the trailer. On appeal, Esterline asserted that, "when the police discovered he had a separate bedroom during the search[,] they were required to limit their search to [Counts's] portion of the trailer." *Id.* at 698. However, despite Esterline's protestations that he rented part of the structure as a separate residence, the searching officers "were not required to simply

10. The trial court did not include a finding about this issue in its denial of the suppression motion.

take Esterline's word at face value." *Id.* at 699; *see also United States v. Canestri*, 518 F.2d 269, 273 (2d Cir. 1975) (explaining that police executing a search warrant were not required to accept as true the declaration of the owner of a single-family house to the effect that one of the rooms belonged to a party omitted from the warrant, because limiting the search's scope upon such declarations would frustrate the purpose of the search warrant).

¶27 In light of this persuasive case law, even if Boyles had informed the searching officers that he maintained his bedroom as a separate residence before they entered it, that information alone would not automatically translate into a finding that the officers were on notice that the bedroom was *actually* a separate residence. Even if the claim had been made to the searching officers, it would be a fact, among others, for the court to weigh in deciding whether "the officers' failure to realize the overbreadth of the warrant was objectively reasonable and understandable." *Maryland v. Garrison*, 480 U.S. 79, 88 (1987).

¶28 With respect to the import of the locked interior door displaying a no-trespassing sign, neither Boyles nor the State cites any controlling authority concerning whether a reasonable officer encountering these indicia must be on notice that a separate residence lies behind the door. Nor does Boyles confront the State's dual contentions that (1) nothing on the door or sign suggested that the locked room belonged to Boyles and (2) a locked door in a house used for drug transactions suggests a "stash room" used to store drugs and money.

¶29 Instead, Boyles cites several cases from other jurisdictions suggesting that no-trespassing signs indicate a reasonable expectation of privacy such that a search warrant is required. These cases arose in a variety of factual settings, none of which are similar to that presented in this matter. *See State v. Roubique*, 421 So. 2d 859, 862 (La. 1982) (no-trespassing sign posted at entrance of driveway); *People v. Scott*, 593 N.E.2d 1328, 1338 (N.Y. 1992) (no-trespassing signs posted every twenty to thirty feet around 165 acres of rural land); *State v. Kochel*, 2008 ND 28, ¶ 2,

744 N.W.2d 771 (no-trespassing sign posted outside a mobile home with an addition); *McCuller v. State*, 999 S.W.2d 801, 804–05 (Tex. App. 1999) (no-trespassing sign posted outside of a home); *Johnson v. Commonwealth*, 496 S.E.2d 143, 149 (Va. Ct. App. 1998) (in a commercial business property, no-trespassing signs placed in warehouse and adjacent dock areas). Not one of those cases addresses the question before the trial court—whether a no-trespassing sign on a bedroom door inside a house should cause a reasonable officer already in possession of a search warrant for the house to reconsider the continued validity of that warrant as to the area beyond the door.

¶30    Boyles also identifies a case in which the United States Court of Appeals for the Ninth Circuit considered whether police officers overstepped the authority of an otherwise valid warrant. *See Mena v. City of Simi Valley*, 226 F.3d 1031 (9th Cir. 2000). In *Mena*, officers were investigating a drive-by shooting and came to suspect Raymond Romero. *Id.* at 1034. The officers knew that Romero lived in a "residence with a large number of subjects residing in a residence designed for one family." *Id.* (internal quotation marks omitted). Even so, they obtained a warrant to search the entire house and its curtilage, as well as any vehicles parked nearby that belonged to the occupants of the house. *Id.* at 1035. During the execution of the warrant, the officers noticed that "some of the rooms were locked, many with padlocks on the outside of the doors." *Id.* "Nevertheless, the officers proceeded to force entry into these locked rooms," *id.*, and discovered that "the rooms were set up as studio apartment type units, with their own refrigerators, cooking supplies, food, televisions, and stereos," *id.* at 1038. Iris Mena was in one of the rooms, and the officers detained her. *Id.* at 1035.

¶31    Mena brought a civil rights suit against the officers, alleging inter alia that they had obtained an overbroad search warrant and executed an overbroad search. *Id.* at 1036. The officers unsuccessfully moved for summary judgment on the ground that they were entitled to qualified immunity. *Id.* On appeal from the denial of summary judgment, the Ninth Circuit

determined that the search warrant was not overbroad, because there was "absolutely no evidence in the record" that the officers "knew or should have known prior to the application for the warrant that [the house] was a multi-unit dwelling." *Id.* at 1037. It therefore ruled that the officers were entitled to qualified immunity on the overbroad-warrant claim. *Id.* at 1038. The court then determined that "a reasonable jury considering all the facts could determine that it was unreasonable for the officers to continue the search" after discovering the padlocked doors with studio-apartment-type rooms behind them; accordingly, the court affirmed the denial of qualified immunity on the overbroad-search claim. *Id.* at 1039. Contrary to Boyles's assertion, the *Mena* court did not hold that padlocked doors were necessarily sufficient to put the officers on notice that the warrant was overbroad; rather, the court merely determined that summary judgment was inappropriate because a jury *could* find that padlocked doors *and* studio-apartment-type rooms were sufficient for that purpose.

¶32   Boyles also points us to a federal trial court case from Oregon in which the court suppressed evidence officers discovered in a defendant's rented room while they conducted a search pursuant to a warrant for the entire house. *See United States v. Greathouse*, 297 F. Supp. 2d 1264 (D. Or. 2003). The district court reasoned that a thirteen-month lapse between the acts giving rise to probable cause and an agent requesting a search warrant was "simply too long" and that the probable cause was therefore stale. *Id.* at 1273. As an alternative basis for suppressing the evidence, the court determined that agents "should have known there were separate residences within the house and should have stopped and obtained a second warrant for the defendant's bedroom." *Id.* at 1275. Specifically, the court noted that the door to the defendant's room "had a 'Do Not Enter' sign posted," that there was an "apparent absence of any familial or other connection between the residents" of the house, and that when the agents executed the search warrant, the owner of the house "immediately advised" them that "the defendant was a renter and that he lived in the back bedroom."

*Id.* at 1274–75. Since the issuance of *Greathouse*, no court has adopted this aspect of its analysis. Indeed, one court dismissed it as "dicta, which we are not bound to follow." *People v. Gomez*, No. A119510, 2008 WL 5050583, at *5 (Cal. Ct. App. Nov. 26, 2008).

¶33   In contrast, the United States Court of Appeals for the Second Circuit has determined that a locked door is not sufficient to put officers on notice that the room behind the door may be a separate residence. *See United States v. Kyles*, 40 F.3d 519, 524 (2d Cir. 1994). In *Kyles*, two masked and armed robbers held up a bank. *Id.* at 521–22. Their getaway car was later found, containing some of their loot and a pizza parlor job application filled out by Basil Kyles. *Id.* at 522. The job application listed an address, and the police officers obtained a warrant to search the property at that address. *Id.* When officers executed the warrant, they were greeted by Basil's mother. *Id.* During the search, they encountered a locked door. *Id.* Basil's mother informed the officers that the room belonged to another of her sons, Geoffrey Kyles, and that only Geoffrey had the key to the room. *Id.* Undeterred, the officers broke down the door and discovered some of the heisted bills inside. *Id.* When Geoffrey arrived at the house, he was arrested and charged with armed bank robbery.

¶34   Before trial, Geoffrey moved to suppress the evidence discovered in his room, arguing "that his bedroom was a separate residence not covered by the warrant because the door was locked, only he possessed the key, and he was not named in the affidavit underlying the search warrant." *Id.* at 522–23. The trial court denied the motion, ruling that "Geoffrey's exclusive possession of the key to his bedroom, by itself, did not render his bedroom a separate residence." *Id.* at 523. On appeal, the Second Circuit concluded that the warrant authorized the officers to "break the lock and search the room" because the bedroom was not a "separate residential unit." *Id.* at 524. The Second Circuit explained that "[f]actors that indicate a separate residence include separate access from the outside, separate doorbells, and separate mailboxes," and determined that the absence of these

features left the officers with "no reason to believe Geoffrey's room was a separate residence" despite the mother's statement that the only key to the room was held by Geoffrey. *See id.*

¶35  Several other courts have also declined to find locks dispositive of the issue. For example, the Hawaii Supreme Court explained that a "lock on [the defendant's] bedroom door [does] not, by itself, automatically elevate his bedroom to the status of a separate residential unit." *State v. Anderson*, 935 P.2d 1007, 1018 (Haw. 1997). The Idaho Court of Appeals held that "there was very little, if anything, to create a belief that [there] were separate subunits" within a house despite "the presence of locks on the doors—which [an] officer testified was not uncommon in single residences occupied by several people." *State v. Reynolds*, 218 P.3d 795, 800 (Idaho Ct. App. 2009). And a Delaware trial court noted that "[a] lock on a bedroom door does not automatically make a bedroom a separate living unit." *State v. Kwalalon*, No. 1312012959, 2015 WL 721255, at *3 (Del. Super. Ct. Feb. 13, 2015).

¶36  The lesson we draw from these cases is simple: there is no bright-line rule that a locked door and no-trespassing sign always denote a separate residence. Rather, the determination of whether a reasonable officer should have been on notice that an interior door led to a separate residence is a factually intensive inquiry that takes into account all of the attendant circumstances.

¶37  The officers executing the search warrant in this matter entered a home that possessed none of the indicia that appellate courts have deemed sufficient to indicate that the persons residing there intended to establish separate residences. The home had a single entrance with a single doorbell and a single mailbox. Unlike the situation presented in *Greathouse*, the record does not reflect that the officers were immediately advised that

Boyles maintained a separate residence behind the locked door.[11] Although the locked door bore a no-trespassing sign, there was no indication that the room belonged to Boyles. Indeed, testimony before the trial court asserted that a locked door in a house used in sale of drugs was consistent with a "stash room" where money and drugs are stored. The record is devoid of any indication that there was anything in Boyles's bedroom that would suggest a separate residence. Based on the record before us, we conclude that the trial court correctly determined that, under these circumstances, there were not sufficient indicia to put a reasonable officer on notice that Boyles's bedroom was a separate residence. We further conclude that the trial court did not err in ruling that the officers relied in good faith on the warrant they possessed and that the evidence uncovered pursuant to that warrant should not be suppressed.

### III. Rule 24(j) Letters

¶38    After he filed his reply brief, Boyles submitted two letters pursuant to rule 24(j) of the Utah Rules of Appellate Procedure. The first raises a contention that "the State illegally enhanced [Boyles's] sentence from a Class B misdemeanor . . . to a Class A misdemeanor." Boyles complains that "the jury [first] needed to find [Boyles] guilty of the underlying offense [before] it could conduct a second proceeding to determine the existence of the enhancement."

¶39    A rule 24(j) letter is limited to citation of supplemental authorities and is neither an opportunity for a party to further argue their case, *see Beynon v. St. George–Dixie Lodge No. 1743, Benevolent & Protective Order of Elks*, 854 P.2d 513, 519 (Utah 1993), nor an appropriate method to raise new appellate claims, *cf. Washington v. Kraft*, 2010 UT App 266U, para. 13 at *4 (noting

---

11. An advisement they would not have been required to accept at face value in any event. *See supra* ¶¶ 25–27.

that issues not adequately discussed in an appellant's opening brief are deemed waived in order to prevent the resulting unfairness to the appellee, who would have no opportunity to respond to the appellant's arguments). Indeed, a letter of supplemental authority must contain "a reference either to the page of the brief or to a point argued orally to which [the supplemental authorities] pertain." *See* Utah R. App. P. 24(j). We will not address the merits of the issues raised for the first time in this rule 24(j) letter. In any event, Boyles's sentence was not enhanced at all. Rather, he was actually charged with a class A misdemeanor and the jury was instructed accordingly.[12]

¶40    The second rule 24(j) letter is a photocopy of a pro se mandamus petition filed by Boyles and several other individuals in a separate case.[13] Like the first rule 24(j) letter, the second rule 24(j) letter addresses issues not raised in Boyles's opening brief, the merits of which we therefore do not address.

CONCLUSION

¶41    Boyles has not identified any information that the officer knew, or should have known, but withheld from the magistrate. He has therefore not shown that the search warrant issued by the magistrate was invalid. We assume, without deciding, that

---

12. Boyles's counsel acknowledged the hurdles faced by the argument advanced in the first rule 24(j) letter and described the letter as "being filed in an *Anders* fashion." *See Anders v. California*, 386 U.S. 738 (1967); *State v. Clayton*, 639 P.2d 168, 169–170 (Utah 1981) (explaining that *Anders* briefs address issues that a defendant wishes to raise but that his or her counsel believes are without merit).

13. This court denied the mandamus petition in a December 15, 2014 order.

Boyles had a reasonable expectation of privacy in his bedroom, but conclude that, based on the record facts, a reasonable officer would not have known that the bedroom was a separate residence. The trial court therefore did not err in denying the motion to suppress.

¶42   Affirmed.

_____