Iris MENA; Jose E. Mena,
Plaintiffs–Appellees,

v.

CITY OF SIMI VALLEY, Defendant,

and

Randy G. Adams; Darin L. Muehler; Robert Brill; Marvin Hodges; Roy Jones; Vincent Allegra; Alan McCord; Richard Thomas; Ronald Chambers; William Lappin; Arnold Baynard; Jeffrey Dominick; Jack Greenburg; Richard Lamb; Frank Ahlvers; John Adamczyk; Tim Brown, Defendants–Appellants.

No. 99–56720.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Aug. 11, 2000

Filed Sept. 22, 2000

---

Karen K. Peabody, Carrington & Nye, Santa Barbara, California, for the defendants-appellants.

James S. Muller, Los Angeles, California, for the plaintiffs-appellees.

Before: NOONAN, TROTT, and
BERZON, Circuit Judges.

TROTT, Circuit Judge:

City of Simi Valley Police Chief Randy
G. Adams and several police officers (collectively "Defendants") appeal the district court's denial of their motion for summary judgment based on qualified immunity. Defendants argue that the district court erred by failing to determine whether, under the clearly established law, the officers reasonably could have believed their conduct in obtaining and executing a search warrant for the residence of Jose and Iris Mena (collectively "Plaintiffs") and in detaining Iris Mena was lawful. We have jurisdiction pursuant to 28 U.S.C. § 1291 and, we AFFIRM in part, REVERSE in part, and REMAND to the district court.

## I

## BACKGROUND

On January 13, 1998, Officers Darin L. Muehler ("Muehler") and Robert Brill ("Brill") of the Simi Valley Police Department ("SVPD") responded to and began investigating a gang-related drive-by shooting in Simi Valley. During their investigation, Officers Muehler and Brill learned that their primary suspect, Raymond Romero, was in possession of a .25 caliber handgun used in the shooting.

In addition, Raymond's brother, Anthony, told Officers Muehler and Brill that Raymond Romero lived on Patricia Avenue in a "poor house," which Anthony explained was "a residence with a large number of subjects residing in a residence designed for one family." Anthony told the officers also that Raymond Romero's friend (and fellow gang member), Genaro Gonzales ("Gonzales"), had lived at the house on Patricia Avenue, but that he believed Gonzales had moved to Mexico. Anthony explained that his brother kept some of his personal property at their mother's house because "Raymond believes these

items would be stolen at the Patricia Avenue location." Finally, Anthony gave the officers his brother's phone number, which was 522–9437.

Subsequently, Officer Muehler had a police dispatcher call Raymond Romero's phone number and pretend there was a problem with the "911" system on Patricia Avenue. The dispatcher asked the man who answered the phone to verify the address from which he was answering. In response, the man stated that the address was 1363 Patricia Avenue. The dispatcher then asked the man to hang up the phone and dial "911," which he did. The incoming phone number was 522–9437, which was listed to Genaro Gonzales. When the dispatcher asked the man if he was Gonzales, he said "No. A friend," and then he said that his name was Raymond. Based on this telephone call and the information learned from Anthony Romero, the officers concluded that Raymond Romero resided at 1363 Patricia Avenue, Simi Valley, California.

The house located at 1363 Patricia Avenue, which Anthony Romero described as a "poor house," was owned by Plaintiff Jose Mena. Although Jose Mena lived at the Patricia Avenue residence only part-time, his daughter, Iris, was a full-time resident. In addition, several other unrelated boarders lived in the Menas' home, renting rooms in the house, space in the garage, and motorhouses and vans parked in the backyard. Notably, Officers Muehler and Brill both had been to the Mena residence on police business on at least two prior occasions.

On January 29, 1998, Officer Muehler executed an affidavit in support of a warrant to search the Mena house for, inter alia, "[d]eadly weapons, specifically firearms including ammunition, casings, holsters and cleaning equipment, knives and accessories such as sheaves; [and] evidence of street gang membership or affiliation with any street gang...." In describing the Mena house, Muehler stated in the affidavit that Anthony Romero had

explained that it was a "poor house," meaning "a residence with a large number of subjects residing in a residence designed for one family." However, Officer Muehler's affidavit did not explain that he had been to the Mena residence before, or that he had observed that all of the doors adjacent to the living room were shut and that some of them had padlocks on them.

Based on Officer Muehler's affidavit, a magistrate judge issued a search warrant for Mena's residence.[1] In particular, the warrant authorized the search of:

> 1363 Patricia Avenue, City of Simi Valley, County of Ventura, State of California, which is further described as a single story, single family dwelling, ... with an attached garage.... To include all rooms, attics, basements, closets, storage areas, attached garages, and other parts therein; and the surrounding grounds and any storage sheds, detached garages, or out buildings of any kind located thereon, any safes or locked boxes therein. Any vehicles that are registered to or belonging to occupants of the residence and that are on or adjacent to the property.

Additionally, the warrant authorized the search of the person of Raymond Joseph Romero.

At approximately 7:00 a.m. on February 3, 1998, several officers from the SVPD, including Muehler and Brill, along with a SWAT team, executed the search warrant on Mena's residence. Defendants claim that, before entering the house, they complied with the knock and announce requirement. Specifically, Defendants declare that they (1) "pounded" on the front door, (2) yelled in both English and Spanish that they were from the SVPD, had a warrant, and intended to enter, (3) waited for approximately thirty seconds, and (4) entered the house after receiving no response. Iris Mena[2] says, on the other hand, that the officers failed to comply with the knock and announce requirement. She bases this claim on her assertion that, although she was sleeping in the bedroom closest to the front door, she was not awakened by the alleged knock and announce. In any event, the officers used a battering ram to force entry into the Mena home.

After entering the house, the officers observed that some of the rooms were locked, many with padlocks on the outside of the doors. Nevertheless, the officers proceeded to force entry into these locked rooms, including the bedroom in which Iris Mena was sleeping. The officers found Iris Mena in bed, forcibly turned her over, handcuffed her, and detained her in the bedroom until the residence was cleared and secured by the entry team. Once the house was secure, the members of the SWAT team left the premises, and the remaining officers searched the residence.

At that point, Iris Mena and the other residents at 1363 Patricia Avenue were taken to the garage where they were detained, in handcuffs, for approximately two to three hours.[3] During this time, the police refused to inform Iris Mena and the others why they were being detained. Moreover, the police contacted the Immigration and Naturalization Service ("INS"), and INS officers arrived at the scene during the search and interrogated the detained residents, including Iris Mena. Finally, when the officers completed

---

1. The magistrate also issued a search warrant for the home of Raymond Romero's mother and brother. That warrant is not at issue in this case.

2. Jose Mena was not present during the warrant service and execution and, therefore, lacks standing to challenge the officers' compliance with the knock and announce requirement. *See United States v. Valencia–Roldan*, 893 F.2d 1080, 1081 n. 1 (9th Cir.1990).

3. There is a dispute about the length of the detention. While Iris Mena declares that she was detained for approximately two to three hours, Defendants assert that the detention lasted only about an hour and a half. For purposes of summary judgment, however, we construe the facts in the light most favorable to the non-moving party. *Crystal v. United States*, 172 F.3d 1141, 1147 n. 9 (9th Cir. 1999). Thus, we assume that Iris Mena's detention lasted between two to three hours.

their search, they took Iris Mena back into her home, removed her handcuffs, and told her of the purpose of the warrant and search.

On October 19, 1998, Plaintiffs filed suit under 42 U.S.C. § 1983, alleging that Defendants violated their civil rights in connection with the February 3, 1998 search of their home. In July 1999, Defendants moved for summary judgment on the ground that Plaintiffs' constitutional rights were not violated, or, alternatively, that Defendants were entitled to qualified immunity. After reviewing the papers and considering oral argument, on August 10, 1999, the district court issued an order denying the summary judgment motion, holding that because (1) "a reasonable trier of fact could conclude that the warrant and/or its execution was 'overbroad,'" and (2) "a reasonable trier of fact could conclude that Iris Mena's detention was unreasonable," Defendants were not entitled as a matter of law to qualified immunity. Defendants now appeal.

## II

### QUALIFIED IMMUNITY STANDARD

 We review de novo a district court's decision denying summary judgment on the ground of qualified immunity. *Moran v. Washington,* 147 F.3d 839, 844 (9th Cir.1998). In deciding whether Defendants are entitled as a matter of law to qualified immunity, we must accept the facts in the light most favorable to the Plaintiffs and then determine whether, in light of clearly established principles governing the conduct in question, the officers objectively could have believed that their conduct was lawful. *See Brewster v. Bd. of Educ. of Lynwood Unified School Dist.,* 149 F.3d 971 (9th Cir.1998); *Act Up!/Portland v. Bagley,* 988 F.2d 868, 871 (9th Cir.1993). "This standard requires a two-part analysis: 1) Was the law governing the official's conduct clearly established? 2) Under that law, could a reasonable officer have believed the conduct was lawful?" *Id.*

## III

### ANALYSIS

In their complaint, Plaintiffs allege that Defendants violated their civil rights by (1) obtaining an overbroad search warrant, (2) executing an overbroad search, (3) unlawfully detaining Iris Mena during the search, (4) conducting the search in an unreasonable manner, and (5) failing to comply with the "knock and announce" requirement. Defendants maintain, however, that they are entitled to qualified immunity because the officers reasonably could have believed that their conduct was lawful under the clearly established law.

### A. Overbreadth of the Search Warrant

■ "The Warrant Clause of the Fourth Amendment categorically prohibits the issuance of any warrant except one 'particularly describing the place to be searched and the persons or things to be seized.'" *Maryland v. Garrison,* 480 U.S. 79, 84, 107 S.Ct. 1013, 94 L.Ed.2d 72 (1987) (quoting U.S. Const. amend. IV). The Supreme Court has held that this requirement is satisfied "if the description is such that the officer with a search warrant can with reasonable effort ascertain and identify the place intended." *Steele v. United States No. 1,* 267 U.S. 498, 503, 45 S.Ct. 414, 69 L.Ed. 757 (1925). Here, there is no doubt that the warrant described the "place to be searched"—1363 Patricia Avenue—with sufficient particularity. Rather, the question is whether the warrant was overbroad because it authorized the search of the *entire* premises at 1363 Patricia Avenue, even though the house was a multi-unit dwelling and probable cause related only to Romero's residential unit and, possibly, common areas of the house.

In deciding whether the warrant was overbroad, we begin with the Supreme Court's decision in *Maryland v. Garrison.* In *Garrison,* the police mistakenly believed that the third floor of a building contained only one residential unit at the

time they applied for, obtained, and initially executed a warrant to search suspect McWebb's apartment for narcotics. Thus, when the officers entered the first unit on that floor, which they believed to be McWebb's apartment, they observed and confiscated contraband. The officers later discovered, however, that the unit they were in actually was rented by Garrison, not McWebb. As soon as the officers realized they were in Garrison's unit, they terminated the search. Nevertheless, Garrison was charged with a crime based on the contraband found in his apartment. *Garrison,* 480 U.S. at 80, 107 S.Ct. 1013.

Garrison moved to suppress the evidence, arguing, inter alia, that the warrant was overbroad. The Supreme Court held that the evidence need not be suppressed on this ground because "the warrant, insofar as it authorized a search that turned out to be ambiguous in scope, was valid when it issued." *Id.* at 86, 107 S.Ct. 1013. The Court explained however, that

> Plainly, if the officers had known, or even if they should have known, that there were two separate dwelling units on the third floor of 2036 Park Avenue, they would have been obligated to exclude respondent's apartment from the scope of the requested warrant. But we must judge the constitutionality of their conduct in light of the information available to them at the time they acted. . . .
> The validity of the warrant must be assessed on the basis of the information that the officers disclosed, or had a duty to discover and to disclose, to the issuing Magistrate.

*Id.* at 85, 107 S.Ct. 1013.

Relying on *Garrison,* Plaintiffs in this case claim that the warrant was overbroad because, unlike the officers in *Garrison,* Officers Muehler and Brill knew or should have known that there were separate dwelling units within the Menas' house. Plaintiffs base this argument on the following facts: (1) Muehler and Brill had been to the house on at least two prior occasions; (2) during one of his prior visits, Officer Muehler observed that all of the doors adjacent to the living room were shut and that some of them were padlocked; and (3) Anthony Romero told the officers that his brother lived in a "residence with a large number of subjects residing in a residence designed for one family."

Although we accept these declarations as true, we reject Plaintiffs' assertion that the warrant was overbroad. There is absolutely no evidence in the record sufficient to create a genuine issue of material fact that either Officer Muehler, Officer Brill, or any other officer of the SVPD knew or should have known prior to the application for the warrant that the Mena residence was a multi-unit dwelling. While it is true that Muehler and Brill both had been to the Mena residence on prior occasions, they were in the house for only a short time. Furthermore, although Muehler testified in his deposition that he observed that all of the doors adjacent to the living room were shut and that some of them were padlocked, he also testified that he did "not know[ ] where those doors led." No evidence refutes this statement. Officer Muehler's description in the affidavit prepared for the warrant of the residence is both accurate and materially consistent with the extrinsic facts as he knew them at the time. The fact that Anthony Romero told the officers that his brother lived in a "residence with a large number of subjects residing in a residence designed for one family" does not suggest that the officers knew or should have known that the house was a multi-unit dwelling. The facts in this case are plainly distinguishable from the facts in *Liston v. County of Riverside,* 120 F.3d 965, 975 (9th Cir.1997), wherein we denied qualified immunity to officers because the plaintiffs there made a sufficient showing of "deliberate or reckless dishonesty" on the part of the affiant for a disputed search warrant.

Under the circumstances, Defendants reasonably could have believed at the time the warrant was issued that there was

probable cause to search the entire premises. *Cf. United States v. Williams,* 917 F.2d 1088, 1091–92 (8th Cir.1990) (holding that officers were entitled to qualified immunity because they did not know the residence for which they obtained a warrant actually contained multiple units). Accordingly, we hold as a matter of law that Defendants are entitled to qualified immunity with regard to the claim that the search warrant for 1363 Patricia Avenue was overbroad. In this respect, we remand with instructions to enter a summary judgment in favor of all Defendants.

### B. Overbreadth of the Search

Plaintiffs' next argument is that the manner in which the search warrant was executed violated their constitutional rights because, even after realizing that there were multiple units within the Mena house, the police searched the entire premises, including the individual residential units. Defendants counter that the execution of the search was valid because probable cause existed to search the entire premises, not just Romero's room and the common areas. We disagree with Defendants.

■ Police officers' authority to search premises that are described in a warrant is not unlimited. "If, during the search, the officers become aware that the warrant describes multiple residences, the officers must confine their search to the residence of the suspect." *United States v. Kyles,* 40 F.3d 519, 524 (2d Cir.1994) (citing *Garrison,* 480 U.S. at 86–87, 107 S.Ct. 1013). To determine whether the officers should have realized they were searching the wrong residence, the *Garrison* court set forth the following standard: "[T]he validity of the search of respondent's apartment pursuant to a warrant authorizing the search of the entire third floor *depends on whether the officers' failure to realize the overbreadth of the warrant was objectively understandable and reasonable.*" *Garrison,* 480 U.S. at 88, 107 S.Ct. 1013 (emphasis added).

■ Here, shortly after beginning the search, the evidence and the reasonable inferences it supports are sufficient to suggest that the officers should have realized that the Menas' house was a multi-unit residential dwelling and, thus, that the warrant was actually overbroad. When the officers first entered the house, they observed that many of the rooms were padlocked from the outside. Furthermore, upon forcing entry into the locked rooms, the officers saw that the rooms were set up as studio apartment type units, with their own refrigerators, cooking supplies, food, televisions, and stereos. Considering that Officers Muehler and Brill knew that a large number of persons lived in the house, and that Muehler had observed the padlocked doors on a prior occasion, we agree with the district court that a jury could conclude from these facts that the officers' search beyond Romero's room and common areas was unreasonable.

■ Defendants argue nevertheless that they are entitled to qualified immunity because their conduct in executing the warrant and in searching the entire premises was objectively reasonable. Generally, if a structure is divided into more than one occupancy unit, probable cause must exist for each unit to be searched. *United States v. Whitney,* 633 F.2d 902, 907 (9th Cir.1980). This rule, however, is not absolute. For example, we have held that

> a warrant is valid when it authorizes the search of a street address with several dwellings if the defendants are in control of the whole premises, if the dwellings are occupied in common, or if the entire property is suspect.

*United States v. Alexander,* 761 F.2d 1294, 1301 (9th Cir.1985); *see also United States v. Frazin,* 780 F.2d 1461, 1467 (9th Cir. 1986).

■ Defendants maintain that there was evidence that the entire premises were suspect because Romero had access to all parts of Mena's residence. Specifically, they argue that the following facts support this conclusion: (1) Romero previ-

ously had secreted a gun at the residence of a fellow gang member; (2) Gonzales, a gang member, had also lived at 1363 Patricia Avenue, although it was believed he had moved to Mexico; (3) street gang members often hide weapons and evidence in their homes and the homes of fellow gang members; (4) Romero had access to areas of the premises occupied by other residents, as evidenced by the fact that he answered Gonzales's phone; and (5) other residents had access to Romero's possessions, as evidenced by the fact that he was worried that some of his belongings might be stolen. In short, Defendants appear to be arguing that, because Romero and Gonzales were gang associates, and they both lived in this house, the police had probable cause to search the *entire* premises at 1363 Patricia Avenue.

We reject Defendants' argument because, at most, the aforementioned facts provided the officers with probable cause to search Romero's room, Gonzales's room (if he still lived there), and common areas. On the other hand, there is virtually no evidence in the record to show that Romero had access to or was in control of the locked rooms inhabited by the other residents, such as Iris Mena.

■ As the district court correctly stated, "the law is well established that the officers 'were required to discontinue the search of [Plaintiffs' property not reasonably in Romero's control] as soon as they discovered that there were [other] separate units [on the property] and therefore were put on notice of the risk that they might be in a [portion of the property] erroneously included within the terms of the warrant.'" (quoting *Garrison*, 480 U.S. at 87, 107 S.Ct. 1013). Because a reasonable jury considering all the facts could determine that it was unreasonable for the officers to continue the search, we affirm the district court's denial of qualified immunity on this claim.

## C. Unlawful Detention

■ Third, Plaintiffs contend that Iris Mena's detention was unlawful on the basis of its duration and the manner in which it was carried out.[4] Defendants once again assert that they are entitled to qualified immunity as a matter of law because "a reasonable officer at the scene could have believed that keeping the four detained residents handcuffed and detained together for the duration of the search was reasonably necessary to avoid danger to the officers and residents, reduce the risk of flight, and avoid interference with the search." Because we conclude that the evidence raises triable issues regarding the reasonableness of the detention, we affirm the district court.

■ The Supreme Court has held that If the evidence that a citizen's residence is harboring contraband is sufficient to persuade a judicial officer that an invasion of the citizen's privacy is justified, it is constitutionally reasonable to require that citizen to remain while officers of the law execute a valid warrant to search his home. Thus, for Fourth Amendment purposes, we hold that a warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted.

*Michigan v. Summers*, 452 U.S. 692, 704–05, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981) (footnotes omitted). However, the Court included a caveat: "[S]pecial circumstances, or possibly a prolonged detention, might lead to a different conclusion in an unusual case...." *Id.* at 705 n. 21, 101 S.Ct. 2587. Thus, "while detentions of occupants during the period of a search will under most circumstances prove to have been reasonable, a detention may be unreasonable in a particular instance either because the detention itself is improper or because it is carried out in an unreason-

4. Plaintiffs also contend that Iris Mena's detention was so extensive that it constituted an arrest, and that such an arrest was not sup-
ported by probable cause. This discrete issue is not before us on appeal.

able manner." *Franklin v. Foxworth*, 31 F.3d 873, 876 (9th Cir.1994); *see also Liston v. County of Riverside*, 120 F.3d at 977–79.

In *Franklin v. Foxworth*, this court denied law enforcement officers qualified immunity on an unlawful detention claim. *Foxworth*, 31 F.3d at 876–78. We held that

> A detention conducted in connection with a search may be unreasonable if it is unnecessarily painful, degrading, or prolonged, or if it involved an undue invasion of privacy. Detentions, particularly lengthy detentions, of the elderly, or of children, or of individuals suffering from serious illness or disability raise additional concerns. Of course, the presence of any of these factors in an individual case does not establish that the detention is unreasonable *per se*. Rather, these factors, along with the *Graham* elements [5] and any other circumstances relevant to an individual case, must be assessed in their totality.

*Id.* at 876. Applying this standard, the *Foxworth* court concluded that the police "executed the warrant in an unreasonable manner, first by removing a gravely ill and semi-naked man from his sickbed without providing any clothing or covering, and then by forcing him to remain sitting handcuffed in his living room for two hours rather than returning him to his bed within a reasonable time after the search of his room was completed." *Id.* at 876–77. In reaching this conclusion, the court reasoned that

> None of the officers had any reason to believe, on the basis of the information they had prior to the search or their observations once in the house, that Curry had committed a crime, or that he was armed. In fact, the officers were not even aware that Curry lived in the house prior to executing the warrant. It

should also have been clear to them that Curry was not a gang member.

*Id.* at 877.

Three years after *Foxworth*, we decided *Liston v. County of Riverside*. In *Liston*, law enforcement officers executed a search warrant for 8293 Saddlecreek Drive, Glen Avon, California. *Liston*, 120 F.3d at 968. The intended target of the search was James "Rocky" Hill. *Id.* At the time the warrant was executed, however, Hill no longer resided at the Saddlecreek residence. *Id.* As a result, the officers mistakenly detained and searched the home of Jim Liston and his family. *Id.*

The Listons sued the officers under 42 U.S.C. § 1983 arguing, inter alia, that their detention was unreasonable and, thus, in violation of the Fourth Amendment. In evaluating this claim, we discussed *Summers* and *Foxworth* and recognized that we must apply a "totality of the circumstances" test. We held that the officers were not entitled to qualified immunity because

> under the Listons' versions of the facts, the officers continued to detain them long after a reasonable officer would have known that the wrong people were in custody and that the house was no longer owned or occupied by Hill—and, thus, long after there was any reasonable cause for continuing to invade the Listons' privacy.

*Id.* at 979.

■ We conclude that, like *Foxworth* and *Liston*, the case at bar may be an example of the "unusual case" contemplated by the Supreme Court in *Summers*. In the course of executing a warrant—the intended target of which was Raymond Romero—Defendants forcibly removed Iris Mena from her bed, handcuffed her, brought her into the garage in her sleeping clothes, and forced her to remain there

---

**5.** The *"Graham* elements" are those elements enumerated in *Graham v. Connor*, 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989), including the severity of the crime, whether the person being detained poses an immediate threat, and whether the suspect is actively resisting arrest or attempting to flee. *Id.* at 396, 109 S.Ct. 1865.

for two to three hours. Because we have now concluded that this search warrant was not invalid, the *Summers* rule would permit these officers as a matter of law to detain Ms. Mena while "a proper search is concluded." *Summers,* 452 U.S. at 705, 101 S.Ct. 2587. And, if the jury here should conclude that the officers did have probable cause to search the entire premises—even after discovering that the Mena's house was a multi-unit residential dwelling as defined in *Garrison*—then the lawful authority to detain Ms. Mean would continue—and a reasonable officer could so conclude on these facts. However, if the jury should conclude that the officers did not have probable cause to search areas other than (1) Romero's room, (2) Gonzales' room, and (3) common areas, then Ms. Mena's detention rests on a different footing and may be justified only in connection with whatever search the jury concludes to have been "proper."

Defendants have produced no evidence that Ms. Mena had committed a crime, posed any sort of threat to the officers, or was in any way resisting arrest or attempting to flee. *See Graham,* 490 U.S. at 396, 109 S.Ct. 1865. In fact, the videotape footage reveals that Ms. Mena, who was only 18 years old at the time, appeared to be sitting quietly and cooperating with the officers. Nevertheless, the police refused to inform Ms. Mena why she was being detained, called out the INS to question her about her citizenship status, and kept her handcuffed throughout the entire two to three hour detention.

Because a jury could conclude on the totality of these facts and circumstances that Iris Mena's detention past the point of a proper search violated the Fourth Amendment, we affirm the district court with respect to her unreasonable detention claim. It, too, shall be decided by a trier of fact.

### D. Conduct During the Search

Next, Plaintiffs assert that the officers violated 42 U.S.C. § 1983 by conducting the search itself in an unreasonable manner, in particular by callously and needlessly ransacking their home and destroying property. We have held that "officers executing a search warrant occasionally 'must damage property in order to perform their duty.'" *Liston,* 120 F.3d at 979 (quoting *Dalia v. United States,* 441 U.S. 238, 258, 99 S.Ct. 1682, 60 L.Ed.2d 177 (1979)). Therefore, the destruction of property during a search does not necessarily violate the Fourth Amendment. *United States v. Becker,* 929 F.2d 442, 446 (9th Cir.1991). Rather, "only unnecessarily destructive behavior, beyond that necessary to execute a warrant effectively, violates the Fourth Amendment." *Liston,* 120 F.3d at 979; *see also Becker,* 929 F.2d at 446.

Here, Iris Mena testified in her deposition that, during the search, the officers unnecessarily broke down two doors that were unlocked. ("And the door that was in the garage, it was already open, and they broke it anyways. And another room that is right in front of Ray's room, it was open, too, at that time, and they broke it, too."). In addition, Ms. Mena testified that she saw Officer Allegra kicking a door on the patio that was already open and saying "I like to destroy these kind of materials, it's cool." In light of this testimony, Defendants appear to have damaged Plaintiffs' property in a way that was "not reasonably necessary to execute [the] search warrant." *Becker,* 929 F.2d at 446. Because a reasonable officer would have known that such conduct if proved was unlawful, we affirm the district court.

### E. Knock and Announce

Lastly, Plaintiffs claim that Defendants violated the Fourth Amendment by failing to "knock and announce" before forcing entry into their home. Specifically, Plaintiffs argue that, because Iris Mena, who was sleeping in the bedroom nearest the front door, was not awakened by the alleged "knock and announce," the police either did not "knock and announce" at all, or they did not "knock and announce" loudly enough to constitute ade-

quate notice. Defendants respond that, in fact, they did comply with the "knock and announce" requirement and, therefore, are entitled to qualified immunity.

The district court denied Defendants' summary judgment motion on this issue because, in light of Iris Mena's and the officers' contradictory testimony, there is an issue of fact as to whether the police announced themselves before forcing entry into the Mena home. We agree that there is, on summary judgment, a triable issue of fact on this question, and affirm the district court.

## IV

## CONCLUSION

For the foregoing reasons, we affirm the district court, except as to the claim that the warrant itself was on its face overbroad. On this claim, we reverse the district court and remand for the entry of summary judgment in favor of the Appellants. AFFIRMED in part, REVERSED in part, and REMANDED for further proceedings consistent with the views expressed herein. ·

The parties shall bear their own costs of this appeal.