**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

SHANIZ WEST,
            *Plaintiff-Appellee*,

v.

CITY OF CALDWELL; CITY OF
CALDWELL POLICE DEPARTMENT;
FORMER CHIEF CHRIS ALLGOOD,
            *Defendants*,

and

DOUG WINFIELD, Sergeant, in his
official and individual capacity;
ALAN SEEVERS; MATTHEW
RICHARDSON,
            *Defendants-Appellants*.

No. 18-35300

D.C. No.
1:16-cv-00359-
REB

OPINION

Appeal from the United States District Court
for the District of Idaho
Ronald E. Bush, Magistrate Judge, Presiding

Argued and Submitted March 7, 2019
Portland, Oregon

Filed July 25, 2019

Before: Susan P. Graber and Marsha S. Berzon, Circuit
Judges, and Eduardo C. Robreno,[*] District Judge.

Opinion by Judge Graber;
Dissent by Judge Berzon

## SUMMARY[**]

### Civil Rights

The panel reversed the district court's order denying
qualified immunity to police officers in an action alleging the
officers violated plaintiff's rights by coercing her consent to
enter her house to search for a suspect and then by shooting
tear gas canisters through the windows and causing extensive
damage to the house.

The panel assumed, without deciding, that plaintiff's
consent to Officer Richardson was not voluntary. The panel
held that given the circumstances, including the amount of
time that passed between Richardson's threat to arrest
plaintiff and his request for consent, the lack of voluntariness
was not so clearly established such that Richardson would
have known that plaintiff's consent was not voluntary.
Richardson was therefore entitled to qualified immunity on
that claim.

---

[*] The Honorable Eduardo C. Robreno, United States District Judge for
the Eastern District of Pennsylvania, sitting by designation.

[**] This summary constitutes no part of the opinion of the court. It has
been prepared by court staff for the convenience of the reader.

The panel held that assuming the consent was voluntary and defendants exceeded the scope of the consent by shooting tear gas into the house, they were still entitled to qualified immunity.  The panel held that given that defendants thought they had permission to enter plaintiff's house to apprehend a dangerous, potentially armed, and suicidal felon barricaded inside, it was not obvious, in the absence of a controlling precedent, that defendants exceeded the scope of plaintiff's consent by causing the tear gas canisters to enter the house in an attempt to flush the suspect out into the open.  Officers Seevers and Winefield were therefore entitled to qualified immunity on this claim.

Addressing the reasonableness of defendants' search, the panel held that given the unusual circumstances, the need for specificity of precedent in the Fourth Amendment context, and controlling cases establishing that officers can sometimes damage a home during a search without violating the occupant's Fourth Amendment rights, this was not an obvious case in which to deny qualified immunity without any controlling precedent clearly establishing that defendants violated plaintiff's rights.  Defendants were therefore entitled to qualified immunity on this claim as well.

Dissenting in part, Judge Berzon stated that in her view defendants Seevers and Winfield were not entitled to qualified immunity on the scope of consent claim.

## COUNSEL

Landon S. Brown (argued) and Bruce J. Castleton, Naylor & Hales P.C., Boise, Idaho, for Defendants-Appellants.

Jeremiah Hudson (argued), Rebecca A. Rainey, and Vaughn Fisher, Fisher Rainey Hudson, Boise, Idaho, for Plaintiff-Appellee.

## OPINION

GRABER, Circuit Judge:

This appeal arises from a SWAT team's search of Plaintiff Shaniz West's house to apprehend her former boyfriend, a gang member who had outstanding felony arrest warrants for violent crimes. Plaintiff sued for extensive damage to her house that resulted from the search. The district court denied qualified immunity to Defendants Matthew Richardson, Alan Seevers, and Doug Winfield, who are officers with the Caldwell, Idaho, police department. We reverse.

### FACTUAL AND PROCEDURAL BACKGROUND[1]

On a summer afternoon in August 2014, Plaintiff's grandmother called 911 to report that: Plaintiff's former boyfriend, Fabian Salinas, was in Plaintiff's house and might be threatening her with a BB gun; Plaintiff's children also were in the house; and Salinas was high on

_____

[1] The relevant facts are undisputed.

methamphetamine.  The grandmother warned the dispatcher that Plaintiff might tell the police that Salinas was not in the house.

The police knew that Salinas was a gang member.  At the time, he had outstanding felony arrest warrants for several violent crimes.  His criminal record included convictions for rioting, discharging a weapon, aggravated assault, and drug crimes.  In addition, during a recent high-speed car chase, Salinas had driven his vehicle straight at a Caldwell patrol car, forcing the officer to swerve off the road to avoid a collision.  The police also had information that Salinas possessed a .32 caliber pistol.

Four officers, including Richardson, responded to the 911 call.  Richardson was familiar with Salinas' criminal history. After arriving at Plaintiff's house, Richardson called Plaintiff's cell phone several times, but she did not answer. He then called Plaintiff's grandmother, who repeated that Salinas was in Plaintiff's house.  She also said that Salinas' sister had been at the house but had left when Salinas arrived. Richardson then called the sister, who confirmed that she had seen Salinas in Plaintiff's house within the last 30 minutes, that he had a firearm that she thought was a BB gun, and that he was high on drugs.  Richardson knocked on the front door of the house but received no response.

While the officers were discussing how to proceed, Sergeant Joe Hoadley noticed Plaintiff walking down the sidewalk toward her house.  Hoadley and Richardson approached Plaintiff.  Richardson asked Plaintiff where Salinas was; she responded that he "might be" inside her house. Richardson followed up: "Might or yes?"  He told Plaintiff that Salinas had a felony arrest warrant, so if Salinas

was in the house and she did not tell the police, she could "get in trouble" for harboring a felon. "Is he in there?" At that point, Plaintiff told Richardson that Salinas was inside her house, even though she did not know if he was still there; she had let Salinas into the house earlier in the day to retrieve his belongings, but she left the house while he was still there. Plaintiff felt threatened when Richardson told her that she could get in trouble if she were harboring Salinas, because Plaintiff's mother had been arrested previously for harboring him.

After Plaintiff told Richardson that Salinas was in the house, Richardson walked away to confer with the other officers. They discussed whether to contact the SWAT team, but Plaintiff did not know that the SWAT team might become involved. Richardson returned to Plaintiff about 45 seconds later. He said: "Shaniz, let me ask you this. Do we have permission to get inside your house and apprehend him?" Plaintiff nodded affirmatively and gave Richardson the key to her front door. Plaintiff knew that her key would not open the door because the chain lock was engaged, but it is unclear from the record whether Richardson also knew that. After handing over the key, Plaintiff called a friend to pick her up, and she left in the friend's car.

Hoadley then called the local prosecutor's office and reported to the on-call prosecutor that Plaintiff consented to having officers enter her house to arrest a person who was subject to a felony arrest warrant. The prosecutor told Hoadley that the officers did not need to obtain a search warrant.

Hoadley next contacted Seevers, the SWAT Commander, to request assistance in arresting a felon who was barricaded

inside a house and who might be armed and on drugs. Seevers, in turn, notified Winfield, the SWAT Team Leader, of the request. Seevers told Winfield that Salinas' family reported that he was in Plaintiff's house with a firearm (described as a BB gun) and that he was suicidal. Winfield contacted Hoadley for more information. Hoadley told him that Salinas had felony arrest warrants, that Salinas was a suspect in a gun theft and that not all the stolen firearms had been recovered, that Salinas was suicidal, and that all signs indicated that Salinas was in Plaintiff's house. Hoadley also told Winfield that Plaintiff had given her consent for officers to enter her house to effect an arrest and that the on-call prosecutor had confirmed that the officers did not need a warrant.

The SWAT team met at the local police station to retrieve their tactical gear and establish a plan. Winfield, who created the plan, hoped to get Salinas to come out of the house without requiring an entry by members of the SWAT team. The plan had three stages: (1) contain Plaintiff's house and issue oral commands for Salinas to come out; (2) if stage one failed, introduce tear gas into the house to force Salinas out; and (3) if stages one and two failed, enter and search the house for Salinas after the tear gas dissipated. Seevers reviewed and approved the plan, which conformed to commonly accepted police practices.

While the SWAT team prepared at the station, the officers at Plaintiff's house continued to watch for Salinas and to update the SWAT team over the radio. One officer reported hearing movement in the house, and another said that he heard the deadbolt latch while he was standing near the front door.

The SWAT team arrived at Plaintiff's house late in the afternoon. They made repeated announcements telling Salinas to come out of the house, but he did not appear. After waiting about 20 minutes, members of the team used 12-gauge shotguns to inject tear gas into the house through the windows and the garage door. After deploying the tear gas, the SWAT team continued to make regular announcements directing Salinas to come out of the house, but still he did not appear. After about 90 minutes the team entered the house. They used Plaintiff's key to unlock the deadbolt on the front door, but they could not enter because of the chain lock. They then moved to the back door, which they opened by reaching through the hole created earlier by shooting the tear gas through the back door's window. The SWAT team searched the entire house without finding Salinas.

Plaintiff and her children could not live in the house for two months because of the damage caused by the search, including broken windows and tear-gas-saturated possessions. The City of Caldwell paid for a hotel for Plaintiff and her children for three weeks and paid her $900 for her damaged personal property. Plaintiff then filed this action, seeking damages and alleging claims for unreasonable search, unreasonable seizure, and conversion.

As relevant here, Defendants moved for summary judgment after the close of discovery, seeking qualified immunity. The district court denied Seevers and Winfield's motion on the ground that it is "well-established that a search or seizure may be invalid if carried out in an unreasonable fashion." The court denied Richardson's motion on the ground that, *if* he had not obtained Plaintiff's voluntary consent, the need for a warrant was clearly established. Defendants timely appealed.

## DISCUSSION[2]

### A. *Principles Governing Qualified Immunity*

Police officers have qualified immunity for their official conduct unless (1) they violate a federal statutory or constitutional right and (2) that right was clearly established at the time of the challenged conduct. *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018). "Clearly established" means that existing law "placed the constitutionality of the officer's conduct 'beyond debate.'" *Id.* (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). The Supreme Court has emphasized, especially in the Fourth Amendment context, that we may not "define clearly established law at a high level of generality." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (per curiam) (quoting *City of San Francisco v. Sheehan*, 135 S. Ct. 1765, 1776 (2015)). Rather, we must locate a controlling case that "squarely governs the specific facts at issue," except in the "rare obvious case" in which a general legal principle makes the unlawfulness of the officer's conduct clear despite a lack of precedent addressing similar circumstances. *City of Escondido v. Emmons*, 139 S. Ct. 500, 503–04 (2019) (per curiam) (quoting *Kisela*, 138 S. Ct. at 1153, and *Wesby*, 138 S. Ct. at 590).[3]

---

[2] We review de novo the district court's denial of qualified immunity, viewing the facts in the light most favorable to Plaintiff and drawing reasonable inferences in her favor. *Kramer v. Cullinan*, 878 F.3d 1156, 1161–62 (9th Cir. 2018). We have jurisdiction to decide the legal questions presented when we assume the truth of Plaintiff's version of the facts. *Jeffers v. Gomez*, 267 F.3d 895, 903 (9th Cir. 2001) (per curiam).

[3] *See, e.g.*, *Hope v. Pelzer*, 536 U.S. 730, 738–41 (2002) (characterizing prison guards' violation of the Eighth Amendment as "obvious" where, long after an emergency situation had ended, the guards

We have discretion to decide which prong of the qualified immunity analysis to address first. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). In our discussion below, we will assume, without deciding, that Defendants violated Plaintiff's rights and will analyze only whether those rights were clearly established as of August 2014.

B. *Voluntariness of Consent*

Plaintiff contends that her consent was not voluntary because Richardson told her that, if Salinas was in the house and she denied it, she could "get in trouble" for harboring a wanted felon. Plaintiff asserts that she felt threatened. As noted, we assume without deciding that her consent for the police to "get inside [her] house" was not voluntary.

The remaining question is whether, in these circumstances, the lack of voluntariness was clearly established such that Richardson would have known that Plaintiff's consent was not voluntary. Those circumstances included: time passed between his threat to arrest Plaintiff for concealing Salinas' whereabouts and his request for consent, during which Richardson walked away from Plaintiff; Plaintiff nodded her assent when Richardson returned and asked her for "permission to get inside [her] house" to arrest Salinas; Plaintiff handed Richardson her house key without being asked for it; Plaintiff knew that Salinas was a wanted felon; and Richardson did not threaten to arrest Plaintiff for withholding consent for the officers to enter her home.

placed a prisoner in leg irons, forced him to remove his shirt, and handcuffed him to a hitching post in the hot sun for seven hours with little water and no bathroom breaks).

In support of her argument, Plaintiff cites *Calabretta v. Floyd*, 189 F.3d 808 (9th Cir. 1999); *United States v. Ocheltree*, 622 F.2d 992 (9th Cir. 1980); and an unpublished district court decision that is not precedential. *See al-Kidd*, 563 U.S. at 741 (holding that a district court decision is not controlling authority in any jurisdiction). The cited cases are clearly distinguishable. Indeed, the differences between the situation that Richardson faced and these two opinions "leap from the page," *Kisela*, 138 S. Ct. at 1154 (quoting *Sheehan*, 135 S. Ct. at 1776).

In *Calabretta*, we denied qualified immunity to a police officer and a social worker who entered a home to perform a child welfare check. When the children's mother opened the front door, the police officer "told her that if she did not admit them, then he would force their way in." 189 F.3d at 811. Thus, the mother did not give voluntary consent to the entry. By contrast, Richardson was attempting to arrest a dangerous felon, not to conduct a welfare check. More importantly, Richardson spoke to Plaintiff away from her house, not at the front door; he did not threaten to force his way into the house against her will; and he did not threaten to arrest Plaintiff if she refused consent to having the police enter her home.

In *Ocheltree*, we ordered suppression of evidence that an agent from the Drug Enforcement Administration obtained after coercing a suspect into opening his briefcase. The agent stopped the suspect at an airport, and the suspect agreed to accompany the agent to his office, where the agent asked for permission to search the briefcase. Even though the agent lacked probable cause, he told the suspect that he would get a search warrant if the suspect failed to consent. We held that the agent's promise to obtain a search warrant clearly

conveyed that the suspect would remain in custody in the meantime; that is, in effect the agent threatened an arrest and detention without probable cause. 622 F.2d at 993–94. By contrast, Richardson did not threaten to arrest Plaintiff if she declined consent. Moreover, after Plaintiff confirmed that Salinas was in the house, Richardson walked away for nearly a minute before returning to ask for permission to enter the house, clearly signaling a lack of intent to detain Plaintiff. And Plaintiff felt comfortable leaving the scene in her friend's car, indicating that she well understood that she was not threatened with detention. Finally, Richardson had probable cause to believe that Salinas was in Plaintiff's house.

Our research has uncovered no controlling Supreme Court or Ninth Circuit decision holding that "an officer acting under similar circumstances as [Defendants] . . . violated the Fourth Amendment." *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (per curiam). Prior precedent must articulate "a constitutional rule specific enough to alert *these* deputies *in this case* that *their particular conduct* was unlawful." *Sharp v. County of Orange*, 871 F.3d 901, 911 (9th Cir. 2017). Given the factors that suggested voluntary consent, we hold that a lack of consent was not clearly established and that a lack of consent was not so obvious that the requirement of similar precedent can be overcome. Richardson is, therefore, entitled to qualified immunity on this claim.

## C. *Scope of Consent*

Plaintiff next argues that, even if she consented voluntarily to entry into her house, Seevers and Winfield exceeded the scope of her consent by having the SWAT team shoot tear gas into the house. As noted, Plaintiff agreed that

officers could "get inside [her] house and apprehend" Salinas, and she knew that Salinas was a wanted felon. Other than the limitation concerning the reason for entry—to arrest Salinas—Plaintiff expressed no limitation concerning, for example, when officers could enter or where in her house the officers would be allowed to look.

As with the other alleged constitutional violations, we assume without deciding that Defendants exceeded the scope of consent by employing tear gas canisters for their initial entry, which is the entry that damaged Plaintiff's house. The dissent goes to great lengths to argue that Defendants violated Plaintiff's Fourth Amendment rights because no reasonable person would have understood Plaintiff's consent to encompass shooting tear gas canisters into the house. But we do not dispute that point here. And, contrary to the dissent's characterization, we do not hold "that a 'typical reasonable person' consenting to an entry to look for a suspect could be understood by a competent police officer as consenting to damage to his or her home so extreme that [it] renders [the home] uninhabitable for months." Dissent at 25. Rather, we assume that Defendants exceeded the scope of consent and address only whether clearly established law, defined at an *appropriate level of specificity*, "placed the constitutionality of the officer's conduct 'beyond debate.'" *Wesby*, 138 S. Ct. at 589 (quoting *al-Kidd*, 563 U.S. at 741). The dissent never comes to grips with this legal standard.

Once again, we conclude that no Supreme Court or Ninth Circuit case clearly established, as of August 2014, that Defendants exceeded the scope of consent. Defendants did "get inside" Plaintiff's house, first with objects and later with people. Plaintiff never expressed a limitation as to time, place within the house, or manner of entry. Defendants did

not, for instance, enter other buildings, exceed an expressed time limit, or enter for a different purpose than apprehending Salinas. To the extent that handing over the key implied that Plaintiff expected Defendants to enter through the front door,[4] Defendants did attempt to do that.

The dissent argues that *Florida v. Jimeno*, 500 U.S. 248, 251 (1991), "clearly established that general consent to search is not without its limitations." Dissent at 24. But in the Fourth Amendment context, the Supreme Court has warned us time and time again that we may not "define clearly established law at a high level of generality." *Kisela*, 138 S. Ct. at 1152 (quoting *Sheehan*, 135 S. Ct. at 1776). *Jimeno* held that it was "reasonable for an officer to consider a suspect's general consent to a search of his car to include consent to examine a paper bag lying on the floor of the car." 500 U.S. at 251. The Court also noted that it would be "very likely unreasonable to think that a suspect, by consenting to the search of his trunk, has agreed to the breaking open of a locked briefcase within the trunk." *Id.* at 251–52. That is the phrase on which the dissent hangs its hat. Dissent at 24. But, outside the context of a vehicle search, *Jimeno* provides nothing more than a general principle for consent; it does not articulate "a constitutional rule specific enough to alert *these* deputies *in this case* that *their particular conduct* was unlawful." *Sharp*, 871 F.3d at 911.

The dissent also cites *United States v. Ibarra*, 965 F.2d 1354, 1357–58 (5th Cir. 1992) (en banc) (per curiam), for the proposition that Defendants exceeded the scope of Plaintiff's consent by causing extensive damage to her home. In *Ibarra*,

---

[4] Plaintiff knew, though, that the key would not open the front door because of the chain lock.

an equally divided Fifth Circuit, sitting en banc, affirmed the district court's ruling that officers exceeded the scope of a guest's general consent to search a house when they used a sledgehammer to break boards that sealed off the attic from the rest of the house. *Id.* For three reasons, *Ibarra* does not provide clearly established law here. First, *Ibarra* is not precedential even in the Fifth Circuit. *See United States v. Yarbrough*, 852 F.2d 1522, 1538 n.8 (9th Cir. 1988) ("Opinions which are affirmed by an equally divided en banc Court of Appeals have no precedential value."); *United States v. Mendoza-Gonzalez*, 318 F.3d 663, 667 n.5 (5th Cir. 2003) ("Decisions by an equally divided en banc court have no value as binding precedent."). Second, because *Ibarra* is an isolated Fifth Circuit case, it cannot provide clearly established law in our circuit. *See Sharp*, 871 F.3d at 911 ("[T]he prior precedent must be 'controlling'—from the Ninth Circuit or Supreme Court—or otherwise be embraced by a 'consensus' of courts outside the relevant jurisdiction." (quoting *Wilson v. Layne*, 526 U.S. 603, 617 (1999))). And third, the factual differences between *Ibarra* and this case "leap from the page." *Kisela*, 138 S. Ct. at 1154 (quoting *Sheehan*, 135 S. Ct. at 1776).

Given that Defendants thought they had permission to enter Plaintiff's house to apprehend a dangerous, potentially armed, and suicidal felon barricaded inside, it is not obvious, in the absence of a controlling precedent, that Defendants exceeded the scope of Plaintiff's consent by causing the tear gas canisters to enter the house in an attempt to flush Salinas out into the open. Seevers and Winfield are, therefore, entitled to qualified immunity on this claim.

The cases that Plaintiff cites in support of her scope-of-consent theory pertain instead to the reasonableness of the search. We turn, next, to that issue.

### D. *Reasonableness of Search and Seizure*

The pivotal question is whether Seevers and Winfield's actions were reasonable. We assume without deciding that Defendants used excessive force by shooting tear gas canisters through the windows of Plaintiff's house as the initial means by which they "[got] inside" the house to search for and arrest Salinas. That is the action that caused the damage underlying Plaintiff's complaint. We examine whether the unreasonableness of Defendants' actions was clearly established as of August 2014.

Defendants reasonably believed that Salinas was in the house, that he was high on meth, that he possessed what had been described as a BB gun, that he was suicidal, and that he owned a .32 caliber pistol. They also knew that he was a gang member with outstanding felony arrest warrants for violent crimes and that he had aggressively tried to run down a patrol car during a recent high-speed chase. We have found no Supreme Court or Ninth Circuit case clearly establishing that the procedure Defendants followed, including the use of tear gas and the resulting destruction, is unreasonable in those circumstances.

Plaintiff cites three cases in support of her argument that the unreasonableness of Defendants' actions was clearly established: *Liston v. County of Riverside*, 120 F.3d 965 (9th Cir. 1997); *Mena v. City of Simi Valley*, 226 F.3d 1031 (9th Cir. 2000); and an unpublished district court decision that is not controlling authority. The stark factual differences

between the published cases and this case preclude a conclusion that the unreasonableness of Defendants' actions was clearly established in August 2014.

In *Liston*, officers damaged property when they executed a search warrant at the wrong house; the man for whom they were searching had sold the house and a different family had moved in. We noted expressly that "officers executing a search warrant occasionally 'must damage property in order to perform their duty.'" 120 F.3d at 979 (quoting *Dalia v. United States*, 441 U.S. 238, 258 (1979)). Thus, we remanded for a determination of when the property damage occurred because, until the officers learned that they had entered the wrong house, they reasonably could have believed "that the way they conducted the search was lawful." *Id.* at 979.

By contrast, Defendants here entered the right house and—because of statements from Plaintiff, her grandmother, and Salinas' sister—they reasonably believed that Salinas was barricaded inside. Defendants also knew that Salinas was a violent, and likely armed, felon. *Liston*, in fact, recognizes that (1) a mistaken but reasonable belief that the object of the search is within the searched premises supports qualified immunity and (2) property damage can occur lawfully during a search.

In *Mena*, we affirmed the denial of qualified immunity for officers who were "unnecessarily destructive" while searching a home. 226 F.3d at 1041. The officers broke down two doors that already were unlocked, and the occupant of the home saw one officer kicking the *open* patio door while declaring: "I like to destroy these kind of materials, it's cool." *Id.* We noted that destroying property during a search

"does not necessarily violate the Fourth Amendment," but "Defendants appear to have damaged Plaintiffs' property in a way that was 'not reasonably necessary to execute the search warrant.'" *Id.* (brackets omitted) (quoting *United States v. Becker*, 929 F.2d 442, 446 (9th Cir. 1991)).

Plaintiff does not claim, and the record does not suggest, that Defendants damaged her house because they thought that doing so was "cool." Moreover, *Mena* simply does not describe an acceptable amount of property damage that a SWAT team may inflict while trying to flush a violent and likely armed felon (who recently had threatened a police officer's life) out of a house.

Another precedent, *Bravo v. City of Santa Maria*, 665 F.3d 1076 (9th Cir. 2011), also bears on our analysis. There, we held that a SWAT team's nighttime incursion is a "far more serious occurrence than an ordinary daytime intrusion" and so requires exigent circumstances. *Id.* at 1085–86. But the search in this case occurred on a summer afternoon, during daylight hours; Defendants knew that Plaintiff was not home and certainly was not asleep inside.

"[T]he ultimate touchstone of the Fourth Amendment is reasonableness," whether officers search a home with a warrant or with the occupant's consent. *Fernandez v. California*, 571 U.S. 292, 298 (2014) (quoting *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006)). Given the unusual circumstances of this case, the need for specificity of precedent in the Fourth Amendment context, and controlling cases establishing that officers can sometimes damage a home during a search without violating the occupant's Fourth Amendment rights, this is not an obvious case in which to deny qualified immunity without any controlling precedent

clearly establishing that Defendants violated Plaintiff's rights. *See Sharp*, 871 F.3d at 912 (explaining that "the obviousness principle has real limits when it comes to the Fourth Amendment," because "officers encounter suspects every day in never-before-seen ways"). Seevers and Winfield are, therefore, entitled to qualified immunity on this claim as well.

## CONCLUSION

Defendants are entitled to qualified immunity because, assuming that their actions violated Plaintiff's Fourth Amendment rights, those rights were not clearly established, at the appropriate level of specificity, in August 2014.

**REVERSED.**

BERZON, Circuit Judge, dissenting in part:

In my view, Defendants Seevers and Winfield are not entitled to qualified immunity on the scope of consent claim. I therefore dissent in part.

## I

Shaniz West returned home to find her house surrounded by the members of the Caldwell Police Department ("the Department"). The Department sought to execute a warrant for the felony arrest of her ex-boyfriend, Fabian Salinas. When Defendant Officer Matthew Richardson asked West whether Salinas was inside her home, she initially expressed uncertainty. West explained that she had asked Salinas to leave when he stopped by earlier to retrieve his belongings

but was unsure whether he had actually left. Only after Officer Richardson informed her that she could be arrested for harboring a felon did West tell him that Salinas was inside (which, it later turned out, he was not). Officer Richardson then asked West, "Do we have permission to get inside your house and apprehend him?" Consenting to the search with a nod of her head, West provided a key to her home but left before any search took place. The Department did not contact her further.

After receiving West's consent to "get inside [her] house and apprehend him," the Department sent a request for assistance to the Special Weapons and Tactics ("SWAT") team. SWAT team leader Doug Winfield and Lieutenant Alan Seevers, respectively, formulated and reviewed a tactical plan. The plan consisted of three phases, all of which were ultimately executed.

First, SWAT, over a public address system, instructed Salinas to leave the house. Second, SWAT used a 12-gauge shotgun to shoot tear gas canisters into the home, breaking windows and extensively damaging the walls and ceiling in the process. SWAT then waited 90 minutes for the tear gas to spread and force Salinas outside. When Salinas did not come out and the tear gas had dissipated, SWAT implemented the final phase of the tactical plan, entering the residence to look for Salinas. Before entering, SWAT attempted to enter through the front door with the key West provided but could not gain entry, as the chain lock was engaged. SWAT next tried the back door, reaching through a window the tear gas

canisters had broken and unlocking the back door.[1] The subsequent search of West's home revealed that Salinas was not inside.

The fruitless police activity—primarily the use of tear gas before entering the house—extensively damaged West's home. To put the extensive property injury in context: West's personal belongings and the home itself were saturated in tear gas; broken glass littered the floor; and the walls and ceiling had gaping holes from contact with the tear gas canisters. In the aftermath of the destruction, West and her children could not live in their home for several months.

West filed suit against the City of Caldwell, the Caldwell Police Department, and the individual officers involved in the search. Among other things, she alleged that Winfield and Seevers exceeded the scope of her consent by designing and executing a tactical plan that culminated in making her home uninhabitable.

## II

"The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness—what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *Florida v. Jimeno*, 500 U.S. 248, 251 (1991). Contrary to the majority's reading of West's consent—which quite frankly, borders on the fantastic—no "typical reasonable person [would] have understood . . . the exchange

---

[1] West asserted that the key unlocked both the front and back door. There is no indication in the record that the SWAT team ever tried the key on the back door.

between . . . [O]fficer [Richardson] and [West]" as permitting the throwing of destructive tear gas canisters into her house from the *outside*, before any officers even attempted to "get *inside* [the] house and apprehend [Salinas]." (emphasis added). Interpreting the exchange between West and Officer Richardson as permitting the SWAT attack on West's house as performed is patently unreasonable. Any reasonable officer would have known at the time that the search exceeded the scope of West's consent, for two principal reasons.

*First*, West's consent quite obviously contemplated an entry by live human beings, not the tossing of incendiary objects into the house from the outside. That understanding is confirmed by the framing of Officer Richardson's consent request. Officer Richardson asked, "Do *we* have permission to get inside your house and apprehend him," incorporating the understanding that "we"—the officers—would be entering the house. (emphasis added). Furthermore, in providing Officer Richardson with a key to her home when she consented to the search, West signaled that her consent was for a peaceful entry by actual persons, not a destructive assault on her home from the outside.

The majority adopts an entirely implausible contrary reading of West's consent, one a "typical reasonable person [would not] have understood by the exchange between the officer and the suspect." *Jimeno*, 500 U.S. at 251. Because West "never expressed a limitation as to time, place within the house, or manner of entry," the majority concludes that her consent that officers could "get inside" permitted a violent initial attack on her house with toxic objects. Maj. Op. at 13. In so concluding, the majority supposes that someone who permits law enforcement officers to "get inside [her] house" while handing over a key consents to the officers *not*

entering the house but instead lobbing dangerous objects, such as tear gas canisters—or stones or bombs, for other examples—into the house from the outside. It further presupposes that, in providing consent to entry, a resident must preemptively forbid actions no one would guess are contemplated by the commonsense understanding of the articulated consent. That is not the law. *See Jimeno*, 500 U.S. at 251.

That no "typical reasonable person" would have understood West's exchange with Officer Richardson as the majority's far-fetched reading suggests is further confirmed by considering *why* the tear gas canisters were thrown into the home. SWAT deployed the tear gas canisters to entice Salinas to leave the house on his own volition. West's consent obviously did not contemplate that manner of apprehension. West permitted officers (1) "to get inside [her] house and [(2)] apprehend him," in that order. That permission signifies that officers were to "apprehend him" while still "inside" the residence, not that foreign objects would be thrown into the home to force Salinas to leave the house and that the officers would then arrest him outside.

In short, despite the majority's attempt to distort West's consent, any "typical reasonable person" would have understood the exchange as permitting a physical entry by actual persons only, in which officers would try to find Salinas in the house and arrest him there.

*Second*, even if West consented to a plan that covered attacks on her house from the outside with dangerous objects, a reasonable officer would have known that, at some point, the destruction of property could exceed the scope of West's consent. In *Jimeno*, the Supreme Court held that general

consent to search the suspect's vehicle, without any express limitations on scope, permitted the officer to search the vehicle as well as a paper bag on the vehicle's floor. 500 U.S. at 251. In so holding, *Jimeno* clearly established that general consent to search is not without its limitations. As an example of such inherent limits, *Jimeno* reasoned that "[i]t is very likely unreasonable to think that a suspect, by consenting to the search of his trunk, has agreed to the breaking open of a locked briefcase within the trunk." *Id.* at 251–52.

Applying *Jimeno* to the present case, it is clear that extensive property destruction rendering a home uninhabitable goes beyond the limitations inherent in a general consent to search. Small personal property is not afforded more Fourth Amendment protection than residential properties. So if the "breaking open of a locked briefcase within [a] trunk" is "very likely unreasonable" and exceeds the scope of ordinary consent, it goes without saying that assaulting a home with tear gas and making the residential property uninhabitable for months is likewise unreasonable, and exceeds the scope of consent. *Id.* A resident need not expressly state, for example, that the officers could "get inside [her] house and apprehend [Salinas]," but could not attack it with incendiary objects that would make it impossible to live in the house. As in the *Jimeno* hypothetical, that limitation is inherent in the consent, and a reasonable officer would have so understood.

Notably, I have found *no* federal case that holds—or suggests—otherwise. Although some cases have held that there are circumstances in which a general consent to search

allows for intentional damage to personal property,[2] no appellate decision, as far as I can tell, has approved massive damage to a dwelling after a general consent to search. *See also United States v. Ibarra*, 965 F.2d 1354, 1357–58 (5th Cir. 1992) (en banc) (per curiam) (affirming by equally divided court with seven judges determining that the officers exceeded the scope of consent by using a sledgehammer to break boards securing entry to the attic).

In concluding that the officers performed a search consistent with West's consent, the majority does what no court has before—it holds that a "typical reasonable person" consenting to an entry to look for a suspect could be understood by a competent police officer as consenting to damage to his or her home so extreme that renders it uninhabitable for months. Aside from its complete implausibility as a matter of common experience, the majority's holding is likely to hamper legitimate law

---

[2] Four circuits have determined that general consent to search does not permit intentional damage to personal property. *See United States v. Garrido-Santana*, 360 F.3d 565, 576 (6th Cir. 2004); *United States v. Torres*, 32 F.3d 225, 231–32 (7th Cir. 1994); *United States v. Zamora-Garcia*, 831 F.3d 979, 983 (8th Cir. 2016); *United States v. Strickland*, 902 F.2d 937, 942 (11th Cir. 1990). The Third, Tenth, and D.C. Circuits have similarly suggested that although a general consent to search a place or item may permit the police to dismantle or temporarily modify that property, the consent does not give the police authorization to destroy that property or otherwise "render it useless." *United States v. Kim*, 27 F.3d 947, 956–57 (3d Cir. 1994) (quoting *United States v. Springs*, 936 F.2d 1330, 1334–35 (D.C. Cir. 1991)); *see also United States v. Osage*, 235 F.3d 518, 521, 522 n.2 (10th Cir. 2000). The Second Circuit allows for intentional damage to personal property in the course of a general consent search. *See United States v. Mire*, 51 F.3d 349, 351–52 (2d Cir. 1995).

enforcement activity by making homeowners extremely
reluctant to agree to consensual searches.

## III

The majority faults this dissent for not providing closely
similar cases to guide the clearly established law inquiry with
regard to the application of *Jimeno*'s "typical reasonable
person" standard. Maj. Op. at 13–15. But this case well
illustrates that some police actions are so *clearly*
unacceptable under the applicable standard that it is the
*absence* of closely similar cases that is most telling. *See Hope
v. Pelzer*, 536 U.S. 730, 741–46 (2002). Here, for example,
the likely reason there are no closely similar cases standing
for the proposition that officers may not use a general consent
to search to take actions that render a home uninhabitable for
months is that law enforcement officers well understand that,
and do not rely on consent alone to conduct home-destructive
activities.

Moreover, contrary to the majority's assumption, the
scope of consent claim in this case is not akin to the various
excessive force cases which have triggered the Supreme
Court's repeated admonitions regarding the need for closely
similar clearly established case law in qualified immunity
cases. Maj. at 13–14. Unlike the many cases in which officers
often face difficult split-second decisions and so need
detailed instructions if they are to be held liable for
constitutional violations, *see, e.g.*, *Stanton v. Sims*, 571 U.S.
3, 10 (2013) (per curiam), the officers here had time to inform
West of the dangerous nature of their intended activities
before relying on her consent. The fact that they decided *not*
to inform her in more detail could suggest that they
anticipated that she would not agree to the search as

performed—as she probably would not have—but proceeded anyway. Given the timing and extensive planning that went into the destructive search of West's home, the dynamic in a case such as this one is entirely different from that in usual excessive force cases, in which the Court has insisted on closely analogous case law for qualified immunity purposes.

There will be, of course, cases in which it will not be clear to law enforcement officers whether the consent obtained reaches the activities undertaken, or in which the preplanned, and consented to, scheme goes awry for reasons beyond the officer's control. In such situations, insistence on affirmative guidance from closely similar cases makes sense before requiring the law enforcement defendants to pay for the plaintiff's injuries.[3] But here, the destructive activities occurred at the outset of SWAT's execution of its scheme and as far as the tear gas itself was concerned, went exactly as planned (although Salinas did not emerge). Where, as here, there is simply no plausible possibility that a "typical reasonable person" would have understood that West agreed to the destruction, the absence of case law approving similar actions on the grounds of general consent should be a sufficient basis to deny qualified immunity.

For the foregoing reasons, I respectfully, but emphatically, dissent.

---

[3] More accurately, the governmental entity's insurer will pay. *See* Joanna C. Schwartz, Police Indemnification, 89 N.Y.U. L. Rev. 885 (2014).